## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PERLECTRIC, INC.**<br>3150 Spring Street<br>Fairfax, VA 22031 | \* <br> \* <br> \* <br> \* | |
| **Plaintiff,** | \* <br> \* | **Case No.:** |
| **v.** | \* <br> \* | |
| **TRAVELERS CASUALTY AND**<br>**SURETY COMPANY OF AMERICA**<br>One Tower Square<br>Hartford, CT 06183 | \* <br> \* <br> \* <br> \* <br> \* | |
| **and** | \* <br> \* | |
| **FEDERAL INSURANCE COMPANY**<br>15 Mountain View Road, P.O. Box 1615<br>Warren, NJ 07061 | \* <br> \* <br> \* <br> \* | |
| **and** | \* <br> \* | |
| **FIDELITY AND DEPOSIT**<br>**COMPANY OF MARYLAND**<br>1400 American Lane<br>Tower 1, 19th Floor<br>Schaumburg, IL 60196 | \* <br> \* <br> \* <br> \* <br> \* <br> \* | |
| **and** | \* <br> \* | |
| **ZURICH AMERICAN INSURANCE**<br>**COMPANY**<br>1400 American Lane<br>Tower 1, 19th Floor<br>Schaumburg, IL 60196 | \* <br> \* <br> \* <br> \* <br> \* <br> \* | |
| **and** | \* <br> \* | |
| **TURNER CONSTRUCTION COMPANY**<br>1015 15th Street, N.W., Suite 1000<br>Washington, D.C. 20005 | \* <br> \* <br> \* <br> \* | |
| **Defendants.** | \* | |

## COMPLAINT

COMES NOW Plaintiff PerLectric, Inc. ("Perlectric"), by and through its undersigned counsel, against Defendants Travelers Casualty and Surety Company of America ("Travelers"), Federal Insurance Company ("Federal"), Fidelity and Deposit Company of Maryland ("Fidelity"), Zurich American Insurance Company ("Zurich"), and Turner Construction Company ("Turner"), and hereby states as follows:

### Parties

1.      Plaintiff PerLectric is a Virginia corporation whose principal place of business is at 2711 Prosperity Avenue, Suite 300, Fairfax, Virginia, 22031. Perlectric is an electrical subcontractor to Turner on a construction project located at 1101 K Street, N.W., Washington, D.C. ("Project").

2.      Upon information and belief, Defendant Travelers is a Payment Bond Surety on Bond Number 104425618 whereon Turner is identified as principal. Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut, and is a Surety duly authorized to conduct surety work in Washington, D.C. A copy of the Payment Bond is attached herewith as Exhibit A.

3.      Upon information and belief, Defendant Federal is a Payment Bond Surety on Bond Number 8193-03-52 whereon Turner is identified as principal. Federal is a New Jersey corporation with its principal place of business in Warren, New Jersey, and is a Surety duly authorized to conduct surety work in Washington, D.C. *See* Exhibit A.

4.      Upon information and belief, Defendant Fidelity is a Payment Bond Surety on Bond Number 08726146 whereon Turner is identified as principal. Fidelity is

a Maryland corporation with its principal place of business in Baltimore, Maryland, and is a Surety duly authorized to conduct surety work in Washington, D.C. *See* Exhibit A.

5.      Upon information and belief, Defendant Zurich is a Payment Bond Surety on Bond Number 08726146 whereon Turner is identified as principal. Zurich is a New York corporation with its principal place of business in Schaumberg, Illinois, and is a Surety duly authorized to conduct surety work in Washington, D.C. *See* Exhibit A.

6.      Upon information and belief, Defendant Turner is a New York corporation whose principal place of business is at 375 Hudson Street, New York, New York, 10014. Turner is licensed as a general contractor in the District of Columbia and is the general contractor on the Project.

## Jurisdiction

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties and the amount in controversy, excluding interests and costs, exceeds $75,000.

## Factual Background

8.      On or about October 14, 2004, JBG/Rockwood 1101 K, L.L.C. ("JBG" or the "Owner"), and Turner entered into a contract ("Prime Contract") under which Turner agreed to construct a 10-story office building located at 1101 K Street, N.W., Washington, D.C.

9.      Defendants Travelers, Federal, Fidelity, and Zurich issued Payment Bonds to Turner, obligating the four sureties to pay Turner's subcontractors in the event that Turner failed to pay for materials and labor furnished to the Project.

10.     On or about December 17, 2004, Turner and PerLectric entered into a Subcontract Agreement ("Subcontract") under which PerLectric agreed to perform the electrical and fire alarm installation required under the Prime Contract.  A copy of the Subcontract is attached herewith as Exhibit B.

11.     The original fixed-price sum of the Subcontract was $1,875,000 ("Subcontract price").

### Turner's Failure To Schedule And Coordinate The Work

12.     Under the Subcontract, Turner and PerLectric agreed that PerLectric "shall execute the Work in accordance with the requirements of the project schedule . . ." *See* Exhibit B, p. 1, Time of Completion.  Further, the Additional Provisions ("AP") outlined that the "work will proceed in accordance with the Project Schedule as developed by the 'Project Team' (Turner Construction Company and its Subcontractors) and revisions made by the 'Project Team.'" AP, Project Coordination and Logistics, § VIII, ¶ K.

13.     The Subcontract also called for the Subcontractor to "participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Work . . ." *See* Exhibit B, p. 1, Time of Completion.

14.     In compliance with the requirements listed in paragraphs 12 and 13 above, PerLectric engaged the professional scheduling firm McDonough Bolyard Peck, in coordination with the Turner scheduler.  Information provided to Turner included a substantial number of meaningful electrical activities that were omitted from the Turner Project Schedule ("Schedule").  In addition, PerLectric provided many logic ties showing the relationships between predecessor and successor activities, which were critical to the proper planning and management of the work sequences.

15.    The professionally prepared scheduling information provided to Turner reflected PerLectric's extensive efforts to develop a workable Schedule.

16.    PerLectric's bid proposal relied upon performing the electrical work in a reasonably productive and logical sequence, based on a Schedule formulated by Turner, with input from PerLectric.

17.    Turner intentionally and for its own benefit, and in breach of the Subcontract, refused to incorporate PerLectric's input into the Schedule.  The Schedule published by Turner was grossly deficient and unusable as a tool for planning and managing the electrical and fire alarm installation work.

18.    The Schedule showed only target dates for completion of work, without any legitimate multi-trade coordinated plan, and omitted a large number of fundamental, critical electrical and fire alarm activities.

19.    In addition, Turner's unilaterally imposed Schedule omitted many key predecessor trade activities required to be performed prior to the execution of PerLectric's electrical and fire alarm work activities, and which were required to provide reasonable access for PerLectric to perform its work productively.

20.    Turner's willful refusal to incorporate PerLectric's input into the Schedule and its failure to reasonably coordinate the subcontractors' work amounted to active interference with PerLectric's ability to perform under the Subcontract and its ability to plan productive electrical and fire alarm installation work.

21.    Ultimately, Turner abandoned its original Schedule and replaced it with repeated physical walkthroughs, surveys, and hand-written lists that identified items of

work that should be performed during the current period measured in two-week look-aheads.

22.    This ad hoc, piecemeal scheduling process required PerLectric to perform work in a radically different manner not contemplated when the parties entered into the Subcontract.

23.    Necessary predecessor activities were not completed or were only partially completed, which frequently hindered and obstructed PerLectric's ability to prosecute its work activities.

24.    Turner's failure to reasonably schedule and coordinate the work prevented PerLectric from performing electrical and fire alarm activities in an efficient sequence or manner, and required it to perform the work in a radically different, piecemeal, service-call-type manner.

25.    As a result, PerLectric experienced a large number of demobilizations and remobilizations, and was hindered by stacking of trades in limited work areas, leading to a substantially increased labor cost not anticipated at the time of its bid.

26.    Due to Turner's willful, deliberate, and intentional refusal and failure to incorporate essential electrical activities and their logical ties to other trade activities, PerLectric was denied the ability to achieve the normal labor production rates reflected in its bid and Subcontract price.

27.    PerLectric frequently sent Turner lists for fire alarm and electrical work, which served as notification to Turner that PerLectric was unable to complete fire alarm and electrical work due to the non-completion of precedent activities of other trades.

28.    Under the Subcontract, PerLectric was entitled to a time extension should it be "delayed, obstructed, hindered, or interfered with in the commencement, prosecution or completion of the Work . . . " *See* Exhibit B, p. 3, Extension of Time.

29.    PerLectric issued numerous written requests for time extensions to its Subcontract milestones due to the inability to access its work areas and delay in completion of precedent activities.    Turner rejected each time extension, forcing PerLectric's work crews into an illogical, uncoordinated, and accelerated manner of performance.

30.    Turner's failure to reasonably cooperate, schedule, and coordinate the trades amounted to active interference with the performance of Perlectric's Subcontract work and a fundamental material breach of contract.

### Turner's Failure To Supply Materials

31.    Turner and PerLectric agreed that Turner would pre-purchase and provide equipment and materials to be installed by PerLectric under the Subcontract.  A copy of the "Pre-Purchase Equipment/Material List" is attached herewith as Exhibit C.

32.    Critical equipment to be provided by Turner included: main switchboard, power busway, busway switches, emergency generator, emergency transfer switches, motor control center, fixtures and lamps, and dimming system.

33.    Turner repeatedly failed to provide the critical materials and equipment in a timely manner and frequently failed to provide the complete or correct amounts of these critical materials and equipment.

34.    Turner's repeated failures caused PerLectric to suffer additional costs for receiving, handling, storing, protecting, and installing the Turner-supplied equipment.

35.    In addition, the inefficient supply of critical materials and equipment by Turner rendered PerLectric unable to perform electrical activities in a normal sequential manner.

36.    Work was performed late, out of sequence, and in incomplete segments, requiring many "come backs" before work activities could be completed.

37.    This inefficient work method caused PerLectric to incur additional, unanticipated costs for the performance of electrical activities that could not be performed while waiting for Turner-supplied materials to be installed.

38.    In forming its bid for the Subcontract work, PerLectric anticipated that Turner would provide Turner-furnished materials in a timely fashion and in the correct quantities.

39.    Turner's failure to provide equipment on time and in the correct quantities actively interfered with PerLectric's ability to perform the Subcontract work in an efficient, cost-effective manner.

40.    Turner's failure prevented PerLectric from providing permanent power to the building, which forced PerLectric to maintain temporary light and power services for an extended and unexpected period of time at a substantial increase in cost.

**Turner's Failure To Provide A Watertight Structure**

41.    Turner also violated its duty under the Subcontract to maintain dry workspaces.

42.    Building leaks damaged sensitive fire alarm equipment, mechanical equipment to which PerLectric needed to electrically connect, and an installed power distribution bus duct.

8

43.    Much of the building, including the main electric room, was exposed to constant water and silt infiltration during much of the Project, due to unsealed openings in walls caused by incorrect concrete installation by Turner.

44.    Turner improperly managed and operated its water pump, causing eight inches of water accumulation in the main electric room.

45.    The numerous disruptive water leaks caused delayed inspections and required retesting and certification of equipment, forcing PerLectric to perform work out of sequence and otherwise inefficiently.

46.    Turner's failure to maintain a dry building required PerLectric to remove, refabricate, and reinstall key power distribution components, which prevented permanent power to be supplied to the building.  This forced PerLectric to maintain temporary light and power services for an extended and unexpected period of time at a substantial increase in cost.

47.    Turner's failure to maintain dry working areas amounted to active interference with PerLectric's ability to perform its electrical and fire alarm work under the Subcontract.

48.    In preparing its bid, PerLectric anticipated performance of its water-sensitive electrical work activities in a proper dry working environment.

49.    Turner's failure to maintain a dry building caused PerLectric to incur additional, unanticipated labor costs.

**Notice Of Claim**

50.    PerLectric's work on the Project was substantially complete on September 15, 2006.

51.    PerLectric, to date, has not received final payment for the base contract work and for outstanding change orders.  Turner has also assessed unwarranted back charges against PerLectric in the amount of $70,457, which PerLectric has disputed in writing.

52.    By letter, dated January 11, 2007, PerLectric submitted a claim for final payment to Turner in the amount of $1,525,840.

53.    By letter, dated March 16, 2007, Turner denied PerLectric's request for final payment.

54.    By letter, dated January 11, 2007, PerLectric submitted a claim for final payment under the Payment Bonds to Travelers, Federal, Fidelity, and Zurich in the amount of $1,525,840.  A copy of the claim letter is attached herewith as Exhibit D.

55.    Travelers, Federal, Fidelity, and Zurich failed to send an answer to PerLectric within 45 days after receipt of PerLectric's claim, as required by the Payment Bonds.  Each Surety failed to inform PerLectric of the amounts that are undisputed or the basis for challenging any amounts that are disputed, as required by the Payment Bonds.  Each surety failed to pay PerLectric or arrange for payment of any undisputed amounts, as required by the Payment Bonds.

56.    PerLectric has complied with all of the conditions precedent to bringing this action under the Payment Bonds.

**COUNT ONE**
**BOND ACTION**
**(Against Travelers, Federal, Fidelity, and Zurich)**

57.    The allegations contained in paragraphs 1 through 56 are incorporated by reference herein as if restated in full.

58.     This action is brought seeking to enforce the Payment Bonds issued on behalf of Turner for the Project undertaken by JBG.

59.     Turner obtained Payment Bonds from Defendants Travelers, Federal, Fidelity, and Zurich.  A copy is attached herewith as Exhibit A.

60.     PerLectric substantially completed all of the work included in the scope of the Subcontract and billed the job as complete on January 11, 2007.  Turner, in bad faith, denied PerLectric's request for final payment on March 16, 2007.

61.     PerLectric has furnished labor and materials to the Project totaling $1,525,840.

62.     PerLectric has complied with all the conditions required of it under the Payment Bonds.

63.     Pursuant to the Payment Bonds, Travelers, Federal, Fidelity, and Zurich are jointly and severally liable with their principal, Turner, for all labor and materials supplied to the Project.

WHEREFORE, PerLectric prays for judgment under of $1,525,840 against Travelers, Federal, Fidelity, Zurich, and Turner plus interest, costs, attorneys' fees, and such other relief the Court deems just and proper.

## COUNT TWO
## BREACH OF CONTRACT
### (Against Turner)

64.     The allegations contained in paragraphs 1 through 63 above are incorporated by reference herein as if restated in full.

65.     Turner breached the Subcontract by failing to provide a workable Schedule, as required by the Subcontract.  Once the inadequacy of its Schedule became

apparent, it was abandoned by Turner, and replaced with oral directives and ad hoc on-site meetings.

66.    Turner breached the explicit provisions of the Subcontract by refusing to allow PerLectric to participate and cooperate in the development of schedules, and ignoring PerLectric's scheduling input.

67.    Turner intentionally and actively interfered with PerLectric's performance of its work and precluded PerLectric from performing its work in a diligent and continuous manner required by the Subcontract.

68.    Turner breached the explicit provisions of the Subcontract by failing to grant PerLectric time extensions caused by Turner's hindrance and delay of PerLectric's work performance.

69.    In addition to breaching the express duties of the Subcontract, Turner violated its implied duties owed to PerLectric under the Subcontract.  These duties include cooperating with the Subcontractor and not hindering the Subcontractor's performance, properly scheduling and sequencing the work, providing critical materials on time, and providing a dry working space.

70.    Turner breached these duties by failing to provide a Schedule that included fundamental, critical activities; refusing to accept and incorporate PerLectric's scheduling information into the Schedule; failing to provide Turner-furnished critical materials and equipment on time and in the correct quantities; and failing to maintain a dry building.

71.    Turner's active interference imposed severe out-of-sequence work activities, which required PerLectric to perform work in an intermittent piecemeal

fashion, the effect of which precluded PerLectric from diligently and continuously prosecuting its work, as required under the Subcontract.

72.    Turner's failure to sequence and coordinate the work was not contemplated by the parties at the time the Subcontract was formed.

73.    In addition, Turner wrongfully refused approval and reimbursement of $241,000 in change order work performed by PerLectric.  Turner also wrongfully assessed PerLectric $70,000 in back charges.

74.    As a direct and proximate result of the material breaches of the Subcontract by Turner, PerLectric suffered damages, including but not limited to additional labor costs in the amount of $1,209,335.  In addition, PerLectric is owed its unpaid contract balance in the amount of $316,505.

WHEREFORE, PerLectric prays for judgment of $1,525,840 against Turner plus interest, costs, attorneys' fees, and such other relief the Court deems just and proper.

### COUNT THREE (IN THE ALTERNATIVE)
### CARDINAL CHANGE (QUANTUM MERUIT)
### (Against Travelers, Federal, Fidelity, Zurich, and Turner)

75.    The allegations contained in paragraphs 1 through 74 above are incorporated by reference herein as if restated in full.

76.    The electrical work for the Project, as performed, was fundamentally and radically different from that which was contemplated or bargained for by the parties when they originally entered into the Subcontract.

77.    Turner's failure to schedule the work, refusal to accept scheduling input from PerLectric, failure to provide critical equipment on time, and failure to provide a dry electrical room were conditions not anticipated by PerLectric when it bid on the Project.

78.    Rather than working with PerLectric to develop an efficient Schedule, Turner eventually resorted to ad hoc, piecemeal, oral directives and hand-written lists that failed to properly coordinate the Subcontractors' activities.

79.    In addition, Turner consistently failed to provide key materials to the Project on a timely basis and was responsible for disruptive water leaks in the building.

80.    The entirety of the impacts on PerLectric's work resulting from Turner's failures was so drastic as to force PerLectric to perform work in a manner that was materially different from what was contemplated under the terms of the Subcontract and constituted a cardinal change to the Subcontract.

81.    Since PerLectric's haphazard manner of performance due to Turner's failure to schedule the work was not contemplated under the terms of the Subcontract, the damages suffered by PerLectric in the form of increased labor costs are not redressable under the Subcontract.

82.    PerLectric is therefore entitled to the reasonable value of the services performed under the radical and different manner and method imposed by Turner's actions, which reasonable value is $3,220,373, less the amount paid to date of $1,694,533.

WHEREFORE, PerLectric prays for judgment of $1,525,840 against Turner plus interest, costs, attorneys' fees, and such other relief the Court deems just and proper.

### COUNT FOUR (IN THE ALTERNATIVE) ABANDONMENT (QUANTUM MERUIT) (Against Travelers, Federal, Fidelity, Zurich, and Turner)

83.    The allegations contained in paragraphs 1 through 82 above are incorporated by reference herein as if restated in full.

84.    The electrical and fire alarm installation work for the Project, as performed, was fundamentally and substantially different from that which was contemplated or bargained for by the parties when they originally entered into the Subcontract.

85.    PerLectric anticipated performing the Subcontract according to a jointly created schedule that reflected key predecessor and fundamental critical and fire alarm activities.

86.    Turner directed PerLectric to perform its electrical and fire alarm activities without benefit of a schedule and made radical changes to the sequence of work.

87.    Turner's drastic changes forced PerLectric to complete its electrical and fire alarm work in an ad-hoc, piecemeal, inefficient manner, that bears no resemblance to the schedule contemplated by the parties at the time the Subcontract was formed.

88.    Turner's original Schedule was abandoned and replaced with two-week look-aheads.    PerLectric agreed to perform the changed work, despite incurring significant increases in cost and time, on the belief that it would be paid by Turner on terms other than those identified in the Subcontract.

89.    Turner's imposition of the radically different scheduling method and PerLectric's performance of its electrical and fire alarm work under this new method was inconsistent with provisions in the Subcontract and implied mutual consent of both parties to depart from its terms.

90.    The departure of both parties from the terms and understandings of the original Subcontract, and the performance of the Subcontract work in such a radically and fundamentally altered manner, constitutes abandonment of the original Subcontract and

creation of an implied-in-fact agreement to pay for the reasonable value of the services actually provided.

91.    PerLectric is entitled to the quantum meruit value of the services performed under the radical and different manner and method imposed by Turner's actions, which reasonable value is $3,220,373, less the amount paid to date of $1,694,533.

WHEREFORE, PerLectric prays for judgment of $1,525,840 against Turner plus interest, costs, attorneys' fees, and such other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PerLectric hereby demands judgment against Travelers, Federal, Fidelity, Zurich, and Turner jointly and severally, in the amount of $1,525,840, plus pre-judgment interest, costs, attorneys' fees, and any such other relief that this Court deems just and proper.

## JURY DEMAND

Pursuant to F.R. Civ. P 38(b), Plaintiff hereby demands a trial by jury in the above-captioned action.


Respectfully submitted,

**PERLECTRIC, INC.**

By its attorneys

Michael A. Lewis (DC Bar #479906)
Herman M. Braude (DC Bar #051326)
BRAUDE & MARGULIES, P.C.
1200 Potomac Street, N.W.
Washington, DC 20007
202-471-5400 (tel)
202-471-5404 (fax)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PerLectric, Inc. | Travelers Casualty & Surety Co. of America, Federal Insurance Co., Fidelity & Deposit Co. of MD, Zurich American Insurance Co., and Turner Construction Co. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Michael S. Lewis
Herman M. Braude
Braude & Margulies, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007
(202) 471-5400

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
**(PLACE AN x IN ONE BOX ONLY)**

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ● 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

<table>
<tr><td colspan="2">

○ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

</td><td colspan="2">

○ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

</td><td colspan="2">

○ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

</td><td colspan="2">

○ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

</td></tr>
</table>

**K.** *Labor/ERISA (non-employment)*

○

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**L.** *Other Civil Rights (non-employment)*

○

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

**M.** *Contract*

◉

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☒ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

**N.** *Three-Judge Court*

○

☐ 441 Civil Rights-Voting (if Voting Rights Act)

---

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. Section 1332, Diversity action based on breach of contract

---

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** 1,525,840    Check YES only if demanded in complaint
**JURY DEMAND:**    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE June 28, 2007    SIGNATURE OF ATTORNEY OF RECORD _____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II.**

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Travelers Bond No. 104425618
Federal Bond No.    8193-03-52
F&D/Zurich Bond No. 08726146

Executed in Two Counterparts

*Conforms with the American Institute of Architects AIA Document A312*

**PAYMENT BOND**

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

---

**CONTRACTOR (Name and Address):**

TURNER CONSTRUCTION COMPANY
3855 Wilson Blvd., Suite 200
Arlington, VA 22203

**SURETY (Name and Principal Place of Business):**

Travelers Casualty and Surety Company of America
One Tower Square
Hartford, CT 06183-6014

Federal Insurance Company
15 Mountain View Road, P.O. Box 1615
Warren, NJ 07061-1615

Fidelity and Deposit Company of Maryland
1400 American Lane, Tower 1, 19th Floor
Schaumburg, IL 60196-1056

Zurich American Insurance Company
1400 American Lane, Tower 1, 19th Floor
Schaumburg, IL 60196

**OWNER (Name and Address):**
JBG/ROCKWOOD 1101 K, L.L.C.
c/o The JBG Companies, 4445 Willard Avenue, Suite 400, Chevy Chase, MD  20815-3690

**CONSTRUCTION CONTRACT**
Date: October 14, 2004
Amount:  Thirty Seven Million Eight Hundred Thirty Thousand Seven Hundred Twenty Five and No/100 Dollars ($37,830,725.00)
Description (Name and Location):
Construction of a 10-story office building located at 1101 K Street, NW, Washington, DC

**BOND**
Date: (Not earlier than Construction Contract Date):  December 30, 2004
Amount:  Thirty Seven Million Eight Hundred Thirty Thousand Seven Hundred Twenty Five and No/100 Dollars ($37,830,725.00)
Modifications to this Bond: NONE

**CONTRACTOR AS PRINCIPAL:**

Company: TURNER CONSTRUCTION COMPANY
Signature:
Name & Title:  THOMAS V. REILLY  VICE PRESIDENT & GENERAL MANAGER

**SURETIES:**
Company:    Travelers Casualty and Surety Company of America

Signature:
Name & Title:   Ann Marie Keane        Attorney-in-Fact

Company:    Federal Insurance Company

Signature:
Name & Title:   Ann Marie Keane        Attorney-in-Fact

Company:    Fidelity and Deposit Company of Maryland

Signature:
Name & Title:   Ann Marie Keane        Attorney in Fact

Company:    Zurich American Insurance Company

Signature:
Name & Title:   Ann Marie Keane        Attorney-in-Fact

4

PENGAD-Bayonne,N.J.

**PLAINTIFF'S EXHIBIT**

A

1.    The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2.    With respect to the Owner, this obligation shall be null and void if the Contractor:

   2.1    Promptly makes payment, directly or indirectly, for all sums due Claimants, and

   2.2    Defends, indemnifies, and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

3.    With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4.    The Surety shall have no obligation to Claimants under this Bond until:

   4.1    Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

   4.2    Claimants who do not have a direct contract with the Contractor:

       .1    Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

   and

       .2    Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

   the

       .3    Not having been paid within the above 30 days, have sent a written notice to the Surety (at address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5.    If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6.    When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

   6.1    Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

   6.2    Pay or arrange for payment of any undisputed amounts.

7.    The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8.    Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9.    The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable to payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10.    The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11.    No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12.    Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13.    When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

14.    Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15.    DEFINITIONS

15.1    Claimant:  An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials, or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas power, light, heat, oil gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineer

15.2    ing services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2    Construction Contract:  The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3    Owner Default:  Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

6

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF

COUNTY OF                                          ss:


On this _____ day of _____ 19 ___, before me personally

appeared _____ to me known, who by me being duly sworn, did depose

and say: that ____he is a member or manager of the limited liability company of

_____,

(Name of LLC)

and that ____he is authorized to execute the attached surety bond in the name of and for

the limited liability company above named, and that ___he acknowledged to me that ___he

signed the attached instrument pursuant to such authority.



_____
Notary Public

My commission expires: _____

# CORPORATE ACKNOWLEDGMENT

Form 152

STATE OF NEW JERSEY
COUNTY OF ESSEX

On this 30th day of December, 2004 before me personally came

ANN MARIE KEANE to me known, who, being by me duly sworn, did depose and say that

she resides in PARSIPPANY, NEW JERSEY that she is the ATTORNEY-IN-FACT OF THE

_____TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA_____

the corporation described in and which executed the above instrument; that she knows the

seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it

was so affixed by order of the Board of Directors of said corporation, and that she signed her

name thereto by like order.

(SEAL)

ALICE McLAUGHLIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MARCH 28, 2008

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

HARTFORD, CONNECTICUT 06183

FINANCIAL STATEMENT AS OF DECEMBER 31, 2003

AS FILED IN THE STATE OF NEW JERSEY

CAPITAL STOCK $ 6,000,000

| ASSETS | | LIABILITIES | |
|---|---:|---|---:|
| CASH & INVESTED CASH | $ 38,371,744 | UNEARNED PREMIUMS | $ 471,374,692 |
| BONDS | 1,798,332,213 | LOSSES | 445,496,512 |
| STOCK | 21,553,141 | LOSS ADJUSTMENT EXPENSES | 100,611,403 |
| OTHER INVESTED ASSETS | | ACCRUED EXPENSES AND OTHER | |
| INVESTMENT INCOME DUE | | LIABILITIES | 188,098,278 |
| AND ACCRUED | 17,572,752 | PROVISION FOR REINSURANCE | 16,775,847 |
| PREMIUM BALANCES | 135,249,471 | | |
| REINSURANCE RECOVERABLE | 42,029,382 | | |
| FEDERAL INC. TAX RECOVERABLE | | TOTAL LIABILITIES | 1,222,356,732 |
| RECEIVABLE FOR SECURITIES | 58,933 | | |
| OTHER ASSETS | (8,252,884) | | |
| | | CAPITAL STOCK | $ 6,000,000 |
| | | PAID IN SURPLUS | 303,297,402 |
| | | OTHER SURPLUS | 510,358,628 |
| | | SURPLUS TO POLICYHOLDERS | 819,656,030 |
| TOTAL | $ 2,042,012,762 | TOTAL | $ 2,042,012,762 |

OF CONNECTICUT                )
COUNTY OF HARTFORD            )SS.
CITY OF HARTFORD

LAWRENCE A. SIUTA, BEING DULY SWORN, SAYS THAT HE IS VICE PRESIDENT, BOND, OF THE TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, AND THAT TO THE BEST OF HIS KNOWLEDGE AND BELIEF, THE FOREGOING IS A TRUE AND CORRECT STATEMENT OF THE FINANCIAL CONDITION OF SAID COMPANY AS OF THE 31ST DAY OF DECEMBER, 2003.

VICE PRESIDENT, BOND

NOTARY PUBLIC

SUBSCRIBED AND SWORN TO BEFORE ME THIS
DAY OF APRIL, 2004



**TRAVELERS CASUALTY AND SURETY COMPANY**
**FARMINGTON CASUALTY COMPANY**
Hartford, Connecticut 06183-9062

## POWER OF ATTORNEY AND CERTIFICATE OF AUTHORITY OF ATTORNEY(S)-IN-FACT

**KNOW ALL PERSONS BY THESE PRESENTS, THAT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY,** corporations duly organized under the laws of the State of Connecticut, and having their principal offices in the City of Hartford, County of Hartford, State of Connecticut, (hereinafter the "Companies") hath made, constituted and appointed, and do by these presents make, constitute and appoint: **Joseph Dobkowski, Jr., Alice McLaughlin, Kathleen M. Cristiano, Sandra K. Wolf, Ann Marie Keane, Rosemarie Richter, Adrianne Scalera, Michele A. Dery,** of Parsippany, New Jersey, their true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred to sign, execute and acknowledge, at any place within the United States, the following instrument(s): by his/her sole signature and act, any and all bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking and any and all consents incident thereto and to bind the Companies, thereby as fully and to the same extent as if the same were signed by the duly authorized officers of the Companies, and all the acts of said Attorney(s)-in-Fact, pursuant to the authority herein given, are hereby ratified and confirmed.

This appointment is made under and by authority of the following Standing Resolutions of said Companies, which Resolutions are now in full force and effect:

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her.

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary.

VOTED: That any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary, or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority.

**This Power of Attorney and Certificate of Authority is signed and sealed by facsimile (mechanical or printed) under and by authority of the following Standing Resolution voted by the Boards of Directors of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, which Resolution is now in full force and effect:**

VOTED: That the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.

'05-04) Unlimited

**ST PAUL
TRAVELERS**

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM
## INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

# CORPORATE ACKNOWLEDGMENT

Form 152

STATE OF NEW JERSEY
COUNTY OF ESSEX

On this 30th day of December, 2004 before me personally came

ANN MARIE KEANE to me known, who, being by me duly sworn, did depose and say that

she resides in PARSIPPANY, NEW JERSEY that she is the ATTORNEY-IN-FACT OF THE

_____FEDERAL INSURANCE COMPANY_____

the corporation described in and which executed the above instrument; that she knows the

seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it

was so affixed by order of the Board of Directors of said corporation, and that she signed her

name thereto by like order.

(SEAL)

_____

ALICE McLAUGHLIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MARCH 28, 2008

# FEDERAL INSURANCE COMPANY

## STATEMENT OF ASSETS, LIABILITIES AND SURPLUS TO POLICYHOLDERS

### Statutory Basis

### DECEMBER 31, 2003

### (In thousands of dollars)

| ASSETS | | | LIABILITIES AND SURPLUS TO POLICYHOLDERS | |
|---|---|---|---|---|
| Cash and Short Term Investments | $ | 861,758 | Outstanding Losses and Loss Expenses ... $ | 8,682,133 |
| United States Government, State and Municipal Bonds | | 8,775,563 | Unearned Premiums | 3,313,631 |
| Other Bonds | | 2,481,174 | Reinsurance Premiums Payable | 442,894 |
| Stocks | | 606,394 | Provision for Reinsurance | 175,251 |
| Other Invested Assets | | 715,809 | Other Liabilities | 1,047,064 |
| TOTAL INVESTMENTS | | 13,441,668 | TOTAL LIABILITIES | 13,660,873 |
| Investments in Affiliates: | | | | |
| Chubb Investment Holdings, Inc. | | 1,203,868 | Capital Stock | 20,980 |
| Pacific Indemnity Company | | 979,181 | Paid – In Surplus | 3,106,730 |
| Executive Risk Indemnity, Inc. | | 519,997 | Unassigned Funds | 3,166,197 |
| Chubb Insurance Company of Europe | | 467,807 | | |
| Great Northern Insurance Company | | 221,868 | | |
| CB Canada Holdings LLC | | 171,594 | | |
| Vigilant Insurance Company | | 97,236 | SURPLUS TO POLICYHOLDERS | 6,293,907 |
| Other Affiliates | | 286,368 | | |
| Premiums Receivable | | 1,529,232 | | |
| Other Assets | | 1,095,287 | | |
| TOTAL ADMITTED ASSETS | $ | 19,954,780 | TOTAL LIABILITIES AND SURPLUS TO POLICYHOLDERS $ | 19,954,780 |

Investments are valued in accordance with requirements of the National Association of Insurance Commissioners. Investments valued at $239,725 are deposited with government authorities as required by law.

State, County & City of New York, — ss:

_____ Anne Marie Loverchio, Assistant Secretary _____ of the Federal Insurance Company being duly sworn, deposes and says that the foregoing Statement of Assets, Liabilities and Surplus to Policyholders of said Federal Insurance Company on December 31, 2003 is true and correct and is a true abstract of the Annual Statement of said Company as filed with the Secretary of the Treasury of the United States for the 12 months ending December 31, 2003.

Subscribed and sworn to before me this

_____
Assistant Secretary

_____
Notary Public

CARL SICILIANO
NOTARY PUBLIC, State of New York
No. 01SI_____
Qualified in Suffolk County
Commission Expires April 23, 2007

Form 27-10-0071A (Rev. 5-04)

**POWER**
**Chubb**
**Surety** **OF**
**ATTORNEY**

Federal Insurance Company
Vigilant Insurance Company
Pacific Indemnity Company

Attn: Surety Department
15 Mountain View Road
Warren, NJ 07059

**Know All by These Presents,** That **FEDERAL INSURANCE COMPANY,** an Indiana corporation, **VIGILANT INSURANCE COMPANY,** a New York corporation, and **PACIFIC INDEMNITY COMPANY,** a Wisconsin corporation, do each hereby constitute and appoint Kathleen M. Cristiano, Joseph Dobkowski, Jr., Ann Marie Keane, Alice McLaughlin, Rosemarie Richter, Adrianne Scalera, Sandra K. Wolf and Michele A. Dery of Parsippany, New Jersey———————————

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

In Witness Whereof, said FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY have each executed and attested these presents and affixed their corporate seals on this 10th day of November, 2004.

_Kenneth C. Wendel_
Kenneth C. Wendel, Assistant Secretary

_John P. Smith_
John P. Smith, Vice President

STATE OF NEW JERSEY
County of Somerset } ss.

On this 10th day of November, 2004 before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By-Laws of said Companies; and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with T. W. Cavanaugh, and knows him to be Vice President of said Companies; and that the signature of T. W. Cavanaugh, subscribed to said Power of Attorney is in the genuine handwriting of T. W. Cavanaugh, and was thereto subscribed by authority of said By-Laws and in deponent's presence.

Notarial Seal



KAREN A. EDER
Notary Public, State of New Jersey
No. 2231647
Commission Expires Oct. 26, 2009

_Karen A. Eder_
Notary Public

**CERTIFICATION**

Extract from the By-Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Secretary, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys-in- Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY (the "Companies") do hereby certify that

(i)     the foregoing extract of the By-Laws of the Companies is true and correct,

(ii)    the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and

(iii)   the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this 30th day of December 2004.





_Kenneth C. Wendel_
Kenneth C. Wendel, Assistant Secretary

IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY
Telephone (908) 903- 3493      Fax (908) 903- 3656      e-mail: surety@chubb.com

This Notice pertains to the following Surety Bond issued by a member insurer of the Chubb Group of Insurance Companies, including Federal Insurance Company, Vigilant Insurance Company and Pacific Indemnity Company.

Bond Number: 8193-03-52

### POLICYHOLDER DISCLOSURE NOTICE
### TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that pursuant to the Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, we are making available to you coverage for losses arising out of certain acts of international terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Coverage for acts of terrorism is already included in the captioned Surety Bond.

You should know that, effective November 26, 2002, any losses caused by acts of terrorism covered by your Surety Bond will be partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States of America pays 90% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. The portion of your premium that is attributable to coverage for such acts of terrorism is zero, because we could not distinguish (and separately charge for) acts of terrorism from other causes of loss when we calculated your premium.

If you have any questions about this notice, please contact your agent or broker.



# CORPORATE ACKNOWLEDGMENT

Form 152

STATE OF NEW JERSEY
COUNTY OF ESSEX

On this 30th day of December, 2004 before me personally came

ANN MARIE KEANE to me known, who, being by me duly sworn, did depose and say that

she resides in PARSIPPANY, NEW JERSEY that she is the ATTORNEY-IN-FACT OF THE

_____ FIDELITY AND DEPOSIT COMPANY OF MARYLAND_____

the corporation described in and which executed the above instrument; that she knows the

seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it

was so affixed by order of the Board of Directors of said corporation, and that she signed her

name thereto by like order.

(SEAL)

ALICE McLAUGHLIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MARCH 26, 2008



# FIDELITY AND DEPOSIT COMPANY
### OF MARYLAND
3910 KESWICK ROAD, BALTIMORE, MD 21203

Statement of Financial Condition
As Of December 31, 2003

## ASSETS

| | | |
|---|---|---|
| Bonds | $ | 125,371,211 |
| Stocks | | 35,569,210 |
| Mortgage Loans | | 2,514,286 |
| Cash in Banks and Offices and Short Term Investments | | 1,188,921 |
| Other Accounts Receivable | | 1,455,823 |
| TOTAL ADMITTED ASSETS | $ | 166,099,451 |

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | | |
|---|---|---|---|
| Reserve for Taxes and Expenses | | $ | 154,962 |
| TOTAL LIABILITIES | | $ | 154,962 |
| Capital Stock, Paid Up | $ 5,000,000 | | |
| Surplus | 160,944,489 | | |
| Surplus as regards Policyholders | | | 165,944,489 |
| TOTAL | | $ | 166,099,451 |

Securities carried at $15,107,804 in the above statement are deposited as required by law.

Securities carried on the basis prescribed by the National Association of Insurance Commissioners. On the basis of December 31, 2003 market quotations for all bonds and stocks owned, the Company's total admitted assets would be $166,895,955 and surplus as regards policyholders $166,740,637.

I, DAVID A. BOWERS, Corporate Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company on the 31st day of December, 2003.

_Corporate Secretary_

State of Illinois  }  SS:
City of Schaumburg  }

Subscribed and sworn to, before me, a Notary Public of the State of Illinois, in the City of Schaumburg, this 27th day of February, 2004.

_Notary Public_

OFFICIAL SEAL
NANCY W. SIEGER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-14-2005

## Power of Attorney
## FIDELITY AND DEPOSIT COMPANY OF MARYLAND

KNOW ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, by THEODORE G. MARTINEZ, Vice President, and ERIC D. BARNES, Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Company, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, does hereby nominate, constitute and appoint **Joseph DOBKOWSKI, JR., Kathleen M. CRISTIANO, Alice McLAUGHLIN, Ann Marie KEANE, Sandra K. WOLF, Rosemarie RICHTER, Adrianne SCALERA, and Michele A. RERY**, all of Parsippany, New Jersey, EACH its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: any and all bonds and undertakings, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons. This power of attorney revokes that issued on behalf of Joseph DOBKOWSKI, JR., Kathleen M. CRISTIANO, Alice McLAUGHLIN, Ann Marie KEANE, Sandra K. WOLF, Rosemarie RICHTER, Adrianne SCALERA, dated May 21, 2004.

The said Assistant Secretary does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article VI, Section 2, of the By-Laws of said Company, and is now in force.

IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seal of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 28th day of October, A.D. 2004.

ATTEST:



FIDELITY AND DEPOSIT COMPANY OF MARYLAND

By:

Eric D. Barnes     *Assistant Secretary*     Theodore G. Martinez

State of Maryland } ss:
City of Baltimore }

On this 28th day of October, A.D. 2004, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came THEODORE G. MARTINEZ, Vice President, and ERIC D. BARNES, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and that the said Corporate Seal and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

Dennis R. Hayden     *Notary Public*
My Commission Expires: February 1, 2005

POA-F 093-3022E

# CORPORATE ACKNOWLEDGMENT

Form 152

STATE OF NEW JERSEY
COUNTY OF ESSEX

On this 30<u>th</u> day of <u>December,</u> 2004 before me personally came

ANN MARIE KEANE to me known, who, being by me duly sworn, did depose and say that

she resides in PARSIPPANY, NEW JERSEY that she is the ATTORNEY-IN-FACT OF THE

_____ZURICH AMERICAN INSURANCE COMPANY_____

the corporation described in and which executed the above instrument; that she knows the

seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it

was so affixed by order of the Board of Directors of said corporation, and that she signed her

name thereto by like order.

(SEAL)

ALICE McLAUGHLIN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MARCH 28, 2008

COMPARATIVE BALANCE SHEET
ONE LIBERTY PLAZA, 165 BROADWAY, 28TH FLOOR, NEW YORK, NY 10006
As of December 31, 2003

| Assets | 12/31/2003 | 12/31/2002 |
|---|---|---|
| Bonds | | |
| Common Stock | $11,123,104,827 | $8,053,597,110 |
| Preferred Stock | 2,400,653,631 | 2,314,993,451 |
| Other Invested Assets | | 46,612,800 |
| Short-term Investments | 40,680,125 | 46,264,679 |
| Cash | 10,091,696 | 212,545,261 |
| Employee Trust for Deferred Compensation Plan | 161,941,804 | 214,475,827 |
| Total Cash and Invested Assets | 40,410,744 | 39,798,000 |
| | 13,776,891,807 | 10,728,288,155 |
| | | |
| Premiums Receivable | | |
| Funds Held with Reinsurers | 3,256,309,477 | 2,813,180,591 |
| Reinsurance Recoverable | 12,148,601 | 204,194 |
| Accrued Investment Income | 1,190,419,364 | 925,213,982 |
| Federal Income Tax Recoverable | 100,009,013 | 89,782,337 |
| Due from Affiliates | 299,686,751 | 217,362,655 |
| Other Assets | 279,783,474 | 133,178,330 |
| Total Assets | 192,176,417 | 238,280,402 |
| | 19,107,423,904 | 15,145,491,028 |
| | | |
| **Liabilities and Policyholders' Surplus** | | |
| **Liabilities:** | | |
| Loss and LAE Reserves | 8,766,566,717 | 7,116,656,852 |
| Loss Portfolio Transfer | (197,129,646) | (324,274,388) |
| Unearned Premium Reserve | 3,836,855,020 | 3,625,672,950 |
| Funds Held with Reinsurers | 1,092,984,371 | 482,431,482 |
| Loss in Course of Payment | 546,485,009 | 279,862,654 |
| Contingent Commission Reserve | 81,142,391 | 45,578,466 |
| Federal Income Tax Payable | 68,896,616 | |
| Payable for Securities | 11,192,230 | 12,802,959 |
| Provision for Reinsurance | 15,530,271 | 34,435,963 |
| Ceded Reinsurance Premiums Payable | 740,669,557 | 643,613,548 |
| Other Liabilities | 689,440,858 | 610,790,972 |
| Total Liabilities | 15,431,833,394 | 12,527,641,464 |
| | | |
| **Policyholders' Surplus:** | | |
| Common Capital Stock | 5,000,000 | 5,000,000 |
| Paid-in and Contributed Surplus | 2,206,131,141 | 2,206,131,141 |
| Surplus Notes | 1,053,000,000 | 703,000,000 |
| Cumulative Unrealized Gain/(Loss) | 207,574,347 | (142,061,763) |
| Dividends Undeclared | 2,298,285 | 4,592,708 |
| Loss Portfolio Transfer Account | 197,129,646 | 306,477,237 |
| Unassigned Surplus | 4,457,093 | (465,289,859) |
| Total Policyholders' Surplus | 3,675,590,510 | 2,617,849,561 |
| | | |
| Total Liabilities and Policyholders' Surplus | 19,107,423,904 | 15,145,491,028 |

I, DAVID A. BOWERS, Corporate Secretary of ZURICH AMERICAN INSURANCE COMPANY do hereby certify that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company, on the 31st day of December, 2003, according to the best of my information, knowledge and belief.

_Corporate Secretary_

State of Illinois
County of Cook  } SS:

Subscribed and sworn to, before me, a Notary Public of the State of Illinois, in the City of Schaumburg, this 27th day of February, 2004.

_Mary B. Minton_
_Notary public_

"OFFICIAL SEAL"
MARY B. MINTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/16/2005

### ZURICH AMERICAN INSURANCE COMPANY

#### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the ZURICH AMERICAN INSURANCE COMPANY, a corporation created by and existing under the laws of the State of New York does hereby nominate, constitute and appoint Joseph DOBKOWSKI, JR., Kathleen M. CRISTIANO, Alice MCLAUGHLIN, Sandra K. WOLF, Ann Marie KEANE, Rosemarie RICHTER, Adrianne SCALERA and Michele A. DERY, all of Parsippany, New Jersey, EACH its true and lawful Attorneys-In-Fact with power and authority hereby conferred to sign, seal, and execute in its behalf, during the period beginning with the date of issuance of this power, any and all bonds and undertakings, recognizances or other written obligations in the nature thereof, and to bind ZURICH AMERICAN INSURANCE COMPANY thereby, and all of the acts of said Attorney[s]-In-Fact pursuant to these presents are hereby ratified and confirmed. This Power of Attorney is made and executed pursuant to and by the authority of the following By-Law duly adopted by the Board of Directors of the Company which By-Law has not been amended or rescinded.

    Article VI, Section 5. "...The President or a Vice President in a written instrument attested by a Secretary or an Assistant Secretary may appoint any person Attorney-In-Fact with authority to execute surety bonds on behalf of the Company and other formal underwriting contracts in reference thereto and to reinsurance agreements relating to individual policies and bonds of all kinds and attach the corporate seal. Any such officers may revoke the powers granted to any Attorney-In-Fact."

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY by unanimous consent in lieu of a special meeting dated December 15, 1998

    " RESOLVED, that the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the seal of the Company may be affixed by facsimile on any Power of Attorney pursuant to Article VI, Section 5 of the By-Laws, and the signature of a Secretary or an Assistant Secretary and the seal of the Company may be affixed by facsimile to any certificate of any such power. Any such power or any certificate thereof with such facsimile signature and seal shall be valid and binding on the Company. Furthermore, such power so executed, sealed and certified by certificate so executed and sealed shall, with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding on the Company."

IN WITNESS WHEREOF, the ZURICH AMERICAN INSURANCE COMPANY has caused these presents to be executed in its name and on its behalf and its Corporate Seal to be hereunto affixed and attested by its officers thereunto duly authorized, this 28th day of October, A.D. 2004. This power of attorney revokes that issued on behalf of Joseph DOBKOWSKI, JR., Kathleen M. CRISTIANO, Alice MCLAUGHLIN, Sandra K. WOLF, Ann Marie KEANE, Rosemarie RICHTER, Adrianne SCALERA, dated May 21, 2004.



### ZURICH AMERICAN INSURANCE COMPANY

STATE OF MARYLAND } ss:
CITY OF BALTIMORE }

By:         *Eric D. Barnes*    Secretary      Theodore G. Martinez    Vice President

On the 28th day of October, A.D. 2004, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came the above named Vice President and Secretary of ZURICH AMERICAN INSURANCE COMPANY, to me personally known to be the individuals and officers described in and who executed the preceding instrument and they each acknowledged the execution of the same and being by me duly sworn, they severally and each for himself deposed and said that they respectively hold the offices in said Corporation as indicated, that the Seal affixed to the preceding instrument is the Corporate Seal of said Corporation, and that the said Corporate Seal, and their respective signature as such officers, were duly affixed and subscribed to the said instrument pursuant to all due corporate authorization.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above.



    *Notary Public*        My Commission Expires: *February 1, 2005*

This Power of Attorney limits the acts of those named therein to the bonds and undertaking specifically named therein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

#### CERTIFICATE

I, the undersigned, a Secretary of the ZURICH AMERICAN INSURANCE COMPANY, do hereby certify that the foregoing Power of Attorney is still in full force and effect, and further certify that Article VI, Section 5 of the By-Laws of the Company and the Resolution of the Board of Directors set forth in said Power of Attorney are still in force.

IN TESTIMONY WHEREOF I have hereto subscribed my name and affixed the seal of said Company

the  30th  day of  December 2004 .

    *Gerald F. Haley*          Secretary

POA-Z ZA 093-3022A

Serial Number: MH2004October28ZA 8/6/04ZA 093-3022A


**ZURICH**

# THIS IMPORTANT DISCLOSURE NOTICE IS PART OF YOUR BOND

Fidelity and Deposit Company of Maryland, Colonial American Casualty and Surety Company, Zurich American Insurance Company, and American Guarantee and Liability Insurance Company are making the following informational disclosures in compliance with The Terrorism Risk Insurance Act of 2002. No action is required on your part.

## Disclosure of Terrorism Premium

The premium charge for risk of loss resulting from acts of terrorism (as defined in the Act) under this bond is $__waived__. This amount is reflected in the total premium for this bond.

## Disclosure of Availability of Coverage for Terrorism Losses

As required by the Terrorism Risk Insurance Act of 2002, we have made available to you coverage for losses resulting from acts of terrorism (as defined in the Act) with terms, amounts, and limitations that do not differ materially as those for losses arising from events other than acts of terrorism.

## Disclosure of Federal Share of Insurance Company's Terrorism Losses

The Terrorism Risk Insurance Act of 2002 establishes a mechanism by which the United States government will share in insurance company losses resulting from acts of terrorism (as defined in the Act) after a insurance company has paid losses in excess of an annual aggregate deductible. For 2002, the insurance company deductible is 1% of direct earned premium in the prior year; for 2003, 7% of direct earned premium in the prior year; for 2004, 10% of direct earned premium in the prior year; and for 2005, 15% of direct earned premium in the prior year. The federal share of an insurance company's losses above its deductible is 90%. In the event the United States government participates in losses, the United States government may direct insurance companies to collect a terrorism surcharge from policyholders. The Act does not currently provide for insurance industry or United States government participation in terrorism losses that exceed $100 billion in any one calendar year.

## Definition of Act of Terrorism

The Terrorism Risk Insurance Act defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:
1. to be an act of terrorism;
2. to be a violent act or an act that is dangerous to human life, property or infrastructure;
3. to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of title 49, United 17 States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and
4. to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

But, no act shall be certified by the Secretary as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

**These disclosures are informational only and do not modify your bond or affect your rights under the bond.**

*Copyright Zurich American Insurance Company 2003*

*1745 1 X*

# TURNER CONSTRUCTION COMPANY

### 3865 WILSON BLVD.
### ARLINGTON, VIRGINIA 22203

#### SUBCONTRACT AGREEMENT
#### #008

**Job:**  Project #11000
1101 K Street
Washington, D.C.

**Subcontractor:**  PerLectric, Inc.
3150 Spring Street
Fairfax, VA  22031-2307

**Date:**  December 17, 2004

**Work:**  Electrical Work



PLAINTIFF'S
EXHIBIT

8

PENGAD-Bayonne, N.J.

**Instructions for Executing Subcontracts:**

**The Subcontractor is to:**

1.  Make no marks whatsoever on this subcontract, biz., erasures, additions, eliminations, interlineations, or marginal notes.

2.  Authorized representative shall initial wherever "Initialed" stamp appears.

3.  Authorized representative shall sign where indicated including **title** and **date** and under his signature **type his name**.

4.  Have his signature witnessed and affix corporate seal.

5.  Return all copies to Turner Construction Company, and be certain that they are not folded or rolled.

**After execution, one signed copy of the Subcontract will be sent to the Subcontractor.**

FORM 36 REV 2/12/01

This Agreement, made of the **Sixth** (6th) day of December in the year 20' , and between TURNER CONSTRUCTION COMPANY, a New York Corpora.. n, (hereinafter called TURNER) and

**PerLectric, Inc.** (a Virginia Corporation)
3150 Spring Street
Fairfax, VA 22031-2307

(hereinafter called the Subcontractor).

Witnesseth, that the Subcontractor and Turner agree as follows:

Article I. The Subcontractor shall perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for **Electrical Work as further defined in the attached Additional Provisions and Scope of Work.**

**Description Of Work**

(hereinafter called the Work) for and at the **1101 K Street** (hereinafter called the Project), located on premises at **1101 K Street, N.W., Washington, DC** (hereinafter called the Premises), as shown and described in and in strict accordance with the Plans, Specifications, General Conditions, Special Conditions and Addenda thereto prepared by **Davis, Carter, Scott, Ltd.** (hereinafter called the Architect) and with the terms and provisions of the General Contract (hereinafter called the General Contract) between Turner and **JBG/Rockwood 1101 K, L.L.C. c/o The JBG Companies** (hereinafter called(s) AP-1 through AP-7 annexed hereto and made a part hereof. the Owner) dated **October 14, 2004** and in strict accordance with the additional Provisions, page

Article II. The Plans, Specifications, General Conditions, Special Conditions, Addenda and General Contract hereinabove mentioned, are available for examination by the Subcontractor at all reasonable times at the office of Turner; all of the aforesaid, including this Agreement, being hereinafter sometimes referred to as the Contract Documents. The Subcontractor represents and agrees that it has carefully examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Turner, or of the Owner, or of any of their respective officers, agents, servants, or employees.

With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to Turner by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Turner all of the duties, obligations and responsibilities that Turner by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that Turner shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Turner with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

**Contract Documents**

This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. If, however, any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract and the other Contract Documents, the provision imposing the greater duty or obligation on the Subcontractor shall govern.

The parties recognize that problems and disputes between them may occur and that it is preferable for them to reach an amicable resolution of same without the need to resort to formal dispute resolution procedures. In that regard, they each pledge to participate in good faith in voluntary and non-binding Alternate Dispute Resolution (ADR) procedures. However, in the event that such disputes are not resolved by mediation or another ADR procedure as Turner and the Subcontractor may agree then such disputes shall be resolved at Turner's sole option either in the manner and forum pursuant to which disputes between the Owner and Turner are to be resolved under the terms of the General Contract or according to law. Furthermore, the Subcontractor agrees that Turner shall have the exclusive right to join the Subcontractor as a party in any dispute resolution procedure (including without limitation ADR procedures, binding arbitration or other judicial or non-judicial proceeding) between the Owner and Turner, together with such other subcontractors or parties as may be appropriate, where in the judgment of Turner the issues in dispute are related to the work or performance of the Subcontractor. Furthermore, the subcontractor expressly agrees to waive its right to trial by jury in case Turner elects to resolve the dispute in litigation.

Article III. The Subcontractor shall commence the Work when notified to do so by Turner and shall diligently and continuously prosecute and complete the Work and coordinate the Work with the other work being performed on the Project, in accordance with those project schedules as may be issued from time to time during the performance of the Work, and any other scheduling requirements listed in this Agreement, so as not to delay, impede, obstruct, hinder or interfere with the commencement, progress or completion of the whole or any part of the Work or other work on the Project.

**Time of Completion**

The Subcontractor shall participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Work providing information for the scheduling of the times and sequence of operations required for its Work to meet Turner's overall schedule requirements, shall continuously monitor the project schedule so as to be fully familiar with the timing, phasing and sequence of operations of the Work and of other work on the Project, and shall execute the Work in accordance with the requirements of the project schedule including any revisions thereto.

Should the progress of the Work or of the Project be delayed, disrupted, hindered, obstructed, or interfered with by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers so as to cause any additional cost, expense, liability or damage to Turner including legal fees and disbursements incurred by Turner (whether incurred in defending claims arising from such delay or in seeking reimbursement and indemnity from the Subcontractor and its surety hereunder or otherwise) or to the Owner or any damages or additional costs or expenses for which Turner or the Owner may or shall become liable, the Subcontractor and its surety shall and does hereby agree to compensate Turner and the Owner for and indemnify them against all such costs, expenses, damages and liability.

1

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub: _____
P.A.: _*SM*_

Turner, if it deems necessary, may direct the Subcontractor to work overtime and, if so directed, the Subcontractor shall work said overtime and, provided that the Subcontractor is not in default under any of the terms or provisions of this Agreement or of any of the other Contract Documents, Turner will pay the Subcontractor for such actual additional wages paid, if any, at rates which have been approved by Turner plus taxes imposed by law on such additional wages, plus workers' compensation insurance, liability insurance and levies on such additional wages if required to be paid by the Subcontractor to comply with Subcontractor's obligations under this Agreement.

If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor in such case, and at its own cost and expense, work such overtime as may be necessary to make up for all time lost in the completion of the Work and of the Project due to such delay. Should the Subcontractor fail to make up for the time lost by reason of such delay, Turner shall have the right to cause other Subcontractors to work overtime and to take whatever other action it deems necessary to avoid delay in the completion of the Work and of the Project, and the cost and expense of such overtime and/or such other action shall be borne by the Subcontractor.

ARTICLE IV. The sum to be paid by Turner, out of funds received from the owner, to the Subcontractor for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement and the other Contract Documents shall be **One Million Eight Hundred Seventy Five Thousand Dollars and No Cents, ($1,875,000.00).**

rice

The Price includes all Federal, State, County, Municipal and other taxes imposed by law and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used for and in connection with the Work, including but not limited to sales, use and personal property taxes payable by or levied or assessed against the Owner, Turner or the Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the Price.

On or before the last day of each month the Subcontractor shall submit to Turner, in the form required by Turner, a written requisition for payment showing the proportionate value of the Work installed to that date, from which shall be deducted: a reserve of ten per cent (10%); all previous payments; all amounts and claims against Subcontractor, by Turner or any third party, for which Subcontractor is responsible hereunder; and all charges for services, materials, equipment and other items furnished by Turner to or chargeable to the Subcontractor; and the balance of the amount of such requisition, as approved by Turner and the Architect and for which payment has been received by Turner from the Owner, shall be due and paid to the Subcontractor on or about the fifteenth (15th) day of the succeeding month or in accordance with the Contract Documents.

onthly
timate

The obligation of Turner to make a payment under this Agreement, whether a progress or final payment, or for extras or change orders or delays to the Work, is subject to the express condition precedent of payment therefor by the Owner. If Turner has provided payment or performance bonds or a combination payment and performance bond, the obligation of Turner and its surety under any of those bonds to make any payment (whether a progress payment or final payment) to a claimant on that bond is similarly subject to the express condition precedent of payment therefor by the Owner.

The Subcontractor shall submit with its first requisition for payment a detailed schedule showing the breakdown of the Price into its various parts for use only as a basis of checking the Subcontractor's monthly requisitions.

Turner reserves the right to advance the date of any payment (including the final payment) under this Agreement if, in its sole judgment, it becomes desirable to do so.

The Subcontractor agrees that, if and when requested to do so by Turner, it shall furnish such information, evidence and substantiation as Turner may require with respect to the nature and extent of all obligations incurred by the Subcontractor for or in connection with the Work, all payments made by the Subcontractor thereon, and the amounts remaining unpaid, to whom and the reasons therefor.

l Payment

Final payment to the Subcontractor shall be made only with funds received by Turner from the Owner, the Construction Lender or the Owner's Agent as final payment for Work under the General Contract. Final payment to Turner by the Owner shall be an express condition precedent which must occur before Turner shall be obligated to make final payment to the Subcontractor. In addition, final payment by Turner to the Subcontractor shall not become due and payable until the following other express conditions precedent have been met: (1) the completion and acceptance of the Work by Turner and the Architect; (2) provision by the Subcontractor of evidence satisfactory to Turner that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes or other items performed, furnished, or incurred for or in connection with the Work; (3) execution and delivery by the Subcontractor, in a form satisfactory to Turner of a general release running to and in favor of Turner and the Owner; and (4) complete and full satisfaction of all claims, demands and disputes, and all obligations and responsibilities of Subcontractor, arising out of or related to the Subcontract, including those as between Turner and Subcontractor as well as those between Subcontractor and any third party. Should there] be any such claim, obligation or lien or unsatisfied obligation or responsibility whether before or after final payment is made, the Subcontractor shall pay, refund or deliver to Turner (1) all monies that Turner and/or the Owner shall pay in satisfying, discharging or defending against any such claim, obligation or lien or any action brought or judgment recovered thereon and all costs and expenses, including legal fees and disbursements, incurred in connection therewith; and (2) such amounts as Turner or Owner shall, in their sole discretion, determine to be an amount sufficient to protect Turner and Owner therefrom (in lieu of payment of such amounts, Subcontractor may, at Owner's and Turner's sole discretion, deliver a bond satisfactory to Turner and Owner). Such refund and payment shall be made within ten (10) days of request by Turner to Subcontractor for same. The final payment shall be due within forty (40) days after all of these express conditions precedent have been met.

2



Sub:
P.A.:  _Sm_

FORM 36 REV 2/12/01

If any claim or lien i    de of or filed with or against Turner, the Owner, the F    t, the Premises or the Project funds by any person claiming that the Subc...actor or any subcontractor or other person under su.contract to Subcontractor, or any person or entity employed or engaged by or through Subcontractor at any tier, has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work, or if any such claim or lien is filed or presented, or if Turner, in good faith, believes that such a claim or lien may be filed or brought, or if at any time there shall be evidence of such nonpayment or of any claim or lien for which, if established, Turner or the Owner might become liable and which is chargeable to the Subcontractor, or if the Subcontractor or any subcontractor or other person under subcontract to Subcontractor, or any person or entity employed or engaged by or through Subcontractor at any tier, causes damage to the Work or to any other work on the Project, or if the Subcontractor fails to perform or is otherwise in default under any of the terms or provisions of this Agreement, Turner shall have the right **(A)** to retain from any payment then due or thereafter to become due an amount which it deems sufficient to (1) satisfy, discharge and/or defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure or default, and (3) compensate Turner and the Owner for and indemnify and hold them harmless against any and all losses, liability, damages, costs and expenses, including legal fees and disbursements, which may be sustained or incurred by either or both of them in connection therewith ; and **(B)** to demand that Subcontractor provide, within ten (10) days of Turner's request therefor, proof to the satisfaction of Turner and Owner that such nonpayment, claim or lien has been fully satisfied, dismissed and discharged. Upon the failure of Subcontractor to fulfill the requirements of a demand issued by Turner pursuant to subsection (B) above, Turner may, in such manner as Turner may in its sole discretion determine, secure the satisfaction, dismissal and discharge of such claim, by payment or otherwise, and Subcontractor shall within ten (10) days of demand therefor, be liable for and pay to Turner all amounts (including legal fees and disbursements) incurred or suffered by Turner or Owner arising out of or related thereto. Turner shall, in addition, have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes. Subcontractor further agrees to indemnify, hold harmless and defend Turner and Owner, upon demand, for any and all such claims, liens, and the costs, expenses (including legal fees and disbursements), damages and liabilities arising out of or related thereto. Subcontractor acknowledges (1) that discharge of such liens or claims by bond imposes liability upon a surety and Turner, and (2) that Turner is not required to discharge such lien or claims by bond when exercising its rights hereunder.

No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials nor shall it release the Subcontractor from any of its obligations under this Agreement; nor shall entrance and use by the Owner constitute acceptance of the Work or any part thereof. The failure of Subcontractor to fully perform and satisfy any or all obligations set forth in this Article IV shall constitute a default, entitling Turner to take action as described in Art. XI.

Article V. Should the Subcontractor be delayed, obstructed, hindered or interfered with in the commencement, prosecution or completion of the Work by any cause including but not limited to any act, omission, neglect, negligence or default of Turner or of anyone employed by Turner or by any other contractor or subcontractor on the Project, or by the Architect, the Owner or their contractors, subcontractors, agents or consultants, or by damage caused by fire or other casualty or by the combined action of workers or by governmental directive or order in no wise chargeable to the Subcontractor, or by any extraordinary conditions arising out of war or government regulations, or by any other cause beyond the control of and not due to any fault, neglect, act or omission of the Subcontractor, its officers, agents, employees, subcontractors or suppliers, then except where the General Contract has specific requirements at variance with the foregoing, in which case the requirements of the General Contract shall govern the Subcontractor shall be entitled to an extension of time for a period equivalent to the time lost by reason of any and all of the aforesaid causes; provided, however, that the Subcontractor shall not be entitled to any such extension of time unless the Subcontractor (1) notifies Turner in writing of the cause or causes of such delay, obstruction, hindrance or interference within forty eight (48) hours of the commencement thereof and (2) demonstrates that it could not have anticipated or avoided such delay, obstruction, hindrance or interference and has used all available means to minimize the consequences thereof. Subcontractor acknowledges that provision of such notice is an essential condition precedent to Subcontractor's rights in connection with any such delays, obstructive hindrances or interferences to Turner's ability to fully identify, and expeditiously, address and avoid such cause or causes, and, accordingly, Subcontractor expressly waives all rights with respect to any such cause or causes for which notice hereunder was not provided. Notwithstanding the foregoing, if the General Contract is at variance with granting such time extension, then the provisions of the General Contract shall control.

The Subcontractor agrees that it shall not be entitled to nor claim any cost reimbursement, compensation or damages for any delay, obstruction, hindrance or interference to the Work except to the extent that Turner has actually recovered corresponding cost reimbursement, compensation or damages from the Owner under the Contract Documents for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which Turner on behalf of the Subcontractor, actually received from the Owner on account of such delay, obstruction, hindrance or interference. Notwithstanding any term or provision herein to the contrary, Subcontractor expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed), recovery of overhead (including home office overhead), and any other indirect damages, costs or expenses in any way arising out of or related to the Agreement, including the breach thereof by Turner, delays, charges, acceleration, loss of efficiency or productivity disruptions and interferences with the performance of the work.

It shall be an express condition precedent to any obligation on the part of Turner to make payment of any such cost, reimbursement, compensation or damages to the Subcontractor hereunder that Turner shall first be determined to be entitled to such compensation on behalf of the Subcontractor and then receive such payment from Owner, and Subcontractor expressly acknowledges that Turner is not obligated or required to pursue Subcontractor claims as against Owner if Turner, in its sole discretion, after review of Subcontractor's claim, has deemed the claim to lack merit in whole or in part.

The Subcontractor agrees that it shall contribute a fair and proportionate share of the costs of advancing the claims of the Subcontractor for delay, including but not limited to legal and other professional fees.

3

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Sub: _____
P.A.: *SM*
Initials

FORM 36 REV 2/12/01

**Freight Charges and Shipments**

Article VI.  The Subcontractor in making or ordering shipments shall not con    or have consigned materials, equipment or any other items in the name of    ner. Turner is under no obligation to make paymer    r charges on shipments made by or to the Subcontractor but may, at its option, pay such charges, in which case the Subcontractor shall reimburse Turner for the amount of such payments plus a service charge of twenty-five percent (25%) of the amount so paid.

**Dimensions**

Article VII.  Notwithstanding the dimensions on the Plans, Specifications and other Contract Documents it shall be the obligation and responsibility of the Subcontractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work.

**Shop Drawings**

The Subcontractor shall prepare and submit to Turner such shop drawings as may be necessary to describe completely the details and construction of the Work.  Approval of such shop drawings by Turner and/or the Architect shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Plans, Specifications, the Additional Provisions hereof and the other Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work and the coordination of the Work with other work being performed on the site, which obligation and responsibility shall continue until completion of the Work.

The Subcontractor's submission of a shop drawing to Turner shall constitute the Subcontractor's representation, upon which Turner may rely, that the Subcontractor has reviewed the submission for accuracy and compliance with all Contract Documents and that wherever engineering is required to be performed, same has been performed by a qualified and licensed engineer.  Furthermore, the review of the Shop Drawing by Turner shall not constitute an undertaking by Turner to identify deficiencies in the submission, that being an undertaking within the sole responsibility of the Subcontractor.

**Contiguous Work**

Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Turner in writing and allow Turner a reasonable time to have such improper conditions and defects remedied.

**Interpretation of Plans and Specifications**

Article VIII.  The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and Turner.  The decision of the Architect as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto.  Turner will furnish to the Subcontractor such additional information and Plans as may be prepared by the Architect to further describe the Work to be performed and furnished by the Subcontractor and the Subcontractor shall conform to and abide by the same.

The Subcontractor shall not make any changes, additions and/or omissions in the Work except upon written order of Turner as provided in Article IX hereof.

Article IX.  Turner reserves the right, from time to time, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or omissions in the Work as it may deem necessary, upon written order to the Subcontractor.  The value of the work to be changed, added or omitted shall be stated in said written order and shall be added to or deducted from the Price.

**Change Orders, Additions and Deductions**

The value of the work to be changed, added or omitted shall be determined by the lump sum or unit prices, if any, stipulated herein for such work.  If no such prices are stipulated, such value shall be determined by whichever of the following methods or combination thereof Turner may elect:

(a)    By adding or deducting a lump sum or an amount determined by a unit price agreed upon between the parties hereto.

(b)    By adding (1) the actual net cost to the Subcontractor of labor in accordance with the established rates, including required union benefits, premiums the Subcontractor is required to pay for workmen's compensation and liability insurance, and payroll taxes on such labor, (2) the actual cost to the Subcontractor of materials and equipment and such other direct costs as may be approved by Turner less all savings, discounts, rebates and credits, (3) an allowance of (See Additional Provisions AP VI, Item B.2) for overhead on items (1) and (2) above, and (4) an allowance of (See Additional Provisions AP VI, Item B.2) for profit on items (1), (2) and (3) above.

Should the parties hereto be unable to agree as to the value of the work to be changed, added or omitted, the Subcontractor shall proceed with the work promptly under the written order of Turner from which order the stated value of the work shall be omitted, and the determination of the value of the work shall be referred to the Architect whose decision shall be final and binding upon the parties hereto.

In the case of omitted work Turner shall have the right to withhold from payments due or to become due to the Subcontractor an amount which, in Turner's opinion, is equal to the value of such work until such time as the value thereof is determined by agreement or by the Architect as hereinabove provided.

All changes, additions or omissions in the Work ordered in writing by Turner shall be deemed to be a part of the Work hereunder and shall be performed and furnished in strict accordance with all of the terms and provisions of this Agreement and the other Contract Documents. Subcontractor accepts the responsibility to keep its surety informed of all such modifications to its contract. The obligations of Subcontractor and Subcontractor's Surety shall not be reduced, waived or adversely affected by the issuance of such change orders, additions or deductions even if subcontractor fails to inform surety of same and Contractor shall not be required to obtain consent of the surety to such modifications.

4

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

Article X.  The Subcontractor shall at all times provide sufficient, safe and proper facilities for the inspection of the Work by Turner, the Architect, and their authorized representatives in the field, at shops or at any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.  The Subcontractor shall, within twenty-four (24) hours after receiving written notice from Turner to that effect, proceed to take down all portions of the Work and remove from the premises all materials whether worked or unworked, which the Architect or Turner shall condemn as unsound, defective or improper or as in any way failing to conform to this Agreement or the Plans, Specifications or other Contract Documents, and the Subcontractor, at its own cost and expense, shall replace the same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or nonconforming work or materials or by the taking down, removal or replacement thereof.

**Inspection and Defective Work**

Article XI.  Should the Subcontractor at any time, whether before or after final payment, refuse or neglect to  supply a sufficiency of skilled workers or materials of the proper quality and quantity, or fail in any respect to prosecute the Work with promptness and diligence, or cause by any act or omission the stoppage, impede, obstruct, hinder or delay of or interference with or damage to the work of Turner or of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents, or should there be filed by or against the Subcontractor a petition in bankruptcy or for an arrangement or reorganization, or should the Subcontractor become insolvent or be adjudicated a bankrupt or go into liquidation or dissolution, either voluntarily or involuntarily or under a court order, or make a general assignment for the benefit of creditors, or otherwise acknowledge insolvency, then in any of such events, each of which shall constitute a default hereunder on the Subcontractor's part, Turner shall have the right, in addition to any other rights and remedies provided by this Agreement and the other Contract Documents or by law, after three (3) days written notice to the Subcontractor mailed or delivered to the last known address of the latter, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to Turner for such purpose, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefor.  In case of such termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Turner and the Architect and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Turner in completing the Work, such excess shall be paid by Turner to the Subcontractor; but if such cost and expense shall exceed such unpaid balance, then the Subcontractor and its surety, if any, shall pay the difference to Turner.  Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of Turner and the Architect and of performing and furnishing all labor, services, materials, equipment, and other items required therefor, but also all losses, damages, costs and expenses, (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default.  Should Turner take action by effectuating the provisions of this paragraph, and should it subsequently be determined that a termination effectuated by the terms of this Article was improper, such termination shall be treated as a termination for convenience pursuant to Article XX below.

**Failure to Prosecute, etc.**

It is recognized that if the Subcontractor institutes or has instituted against it a case under Title 11 of the United States Code (Bankruptcy Code), such event could impair or frustrate the Subcontractor's performance of this Agreement.  Accordingly, it is agreed that upon the occurrence of any such event, Turner shall be entitled to request of Subcontractor or its trustee or other successor adequate assurances of future performance.  Failure to comply with such request within ten (10) days of delivery of the request shall entitle Turner, in addition to any other rights and remedies provided by this Agreement or by law, to terminate this Agreement.  Pending receipt of adequate assurances of performance and actual performance in accordance herewith, Turner shall be entitled to perform and furnish through itself or through others any such labor, materials or equipment for the Work as may be necessary to maintain the progress of the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement. In the event of such bankruptcy proceedings, this Agreement shall terminate if the Subcontractor rejects this Agreement or if there has been a default and the Subcontractor is unable to give adequate assurance that it will perform as provided in this Agreement or otherwise is unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

Subcontractor, in addition to any other rights available to Turner hereunder, agrees to indemnify, hold harmless and defend Turner from and against any and all claims, demands, suits, damages, judgments, liabilities, costs and expenses (including legal fees and disbursements) arising out of or related to (a) Subcontractor's breach of any term of the Agreement.

Article XII.  Turner shall not be responsible for any loss or damage to the Work to be performed and furnished under this Agreement, however caused, until after final acceptance thereof by Turner and the Architect, nor shall Turner be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused.

**Loss or Damage to Work**

Turner or Owner shall effect and maintain fire insurance (with extended coverage, if specified or otherwise required) upon all Work, materials and equipment incorporated in the Project and all materials and equipment on or about the Premises intended for permanent use or incorporation in the Project or incident to the construction thereof, the capital value of which is included in the cost of the Work, but not including any contractors' machinery, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work.

The total value of the property described above as insurable under this Article and as shown on the approved monthly requisition provided for in Article IV, plus the total value of similar property incorporated in the Project or delivered on the Premises during the month but not included in said requisition, as reported by the Subcontractor to Turner for insurance purposes only, shall determine the total value of the Subcontractor's work, materials and equipment to be insured under this Article.

5

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Sub: _____ Initials
P.A.: _____

FORM 36 REV 2/12/01

**Fire Insurance**

The maximum liability to the Subcontractor under this insurance shall be for not more than that proportion of any loss which the last reported value of the insured property bore to the actual value of said property at the time of such last report, and in no event for more than the actual loss.

In the event of a loss insured under this Article, the Subcontractor shall be bound by any adjustment which shall be made between Turner or the Owner and the insurance company or companies. Loss, if any, shall be made payable to Turner and/or the Owner, as their interests may appear, for the account of whom it may concern

**Cleaning Up**

Article XIII. The Subcontractor shall, at its own cost and expense, (1) keep the Premises free at all times from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of its Work by collecting and depositing said materials and rubbish in locations or containers as designated by Turner from which it shall be removed by Turner from the Premises without charge, (2) clean and remove from its own Work and from all contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the execution of its Work and make good all defects resulting therefrom (3) at the completion of its Work in each area, perform such cleaning as may be required to leave the area "broom clean", and (4) at the entire completion of its Work, remove all of its tools, equipment, scaffolds, shanties and surplus materials. Should the Subcontractor fail to perform any of the foregoing to Turner's satisfaction, Turner shall have the right to perform and complete such work itself or through others and charge the cost thereof to the Subcontractor.

**Compliance with Law and Permits**

Article XIV. The Subcontractor shall obtain and pay for all necessary permits and licenses pertaining to the Work and shall comply with all federal, state, municipal and local laws, ordinances, codes, rules, regulations, standards, orders, notices and requirements, including but not limited to those relating to safety, discrimination in employment, fair employment practices or equal employment opportunity, and whether or not provided for by the Plans, Specifications, General Conditions, or other Contract Documents, without additional charge or expense to Turner and shall also be responsible for and correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of its Work. The Subcontractor shall at any time upon demand furnish such proof as Turner may require showing such compliance and the correction of such violations. The Subcontractor agrees to save harmless and indemnify Turner from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor's failure to comply with any of such laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations therefore resulting from or in connection with the performance of Work.

**Labor to be employed**

Article XV. The Subcontractor shall not employ workers, means, materials or equipment which may cause strikes, work stoppages or any disturbances by workers employed by the Subcontractor, Turner or other contractors or subcontractors on or in connection with the Work or the Project or the location thereof. The Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect either nationally or in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this Article shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should the Subcontractor fail to carry out or comply with any of the foregoing provisions, Turner shall have the right, in addition to any other rights and remedies provided by this Agreement or the other Contract Documents or by law, after three (3) days written notice mailed or delivered to the last known address of the Subcontractor, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and, for the purpose of completing the Work, to enter upon the Premises and take possession, in the same manner, to the same extent and upon the same terms and conditions as set forth in Article XI of this Agreement.

Article XVI. The Subcontractor for the Price herein provided, hereby accepts and assumes exclusive liability for and shall indemnify, protect and save harmless Turner and the Owner from and against the payment of:

1.    All contributions, taxes or premiums (including interest and penalties thereon) which may be payable under the Unemployment Insurance Law of any State, Federal Social Security Act, Federal, State, County and/or Municipal Tax Withholding Laws, or any other law, measured upon the payroll of or required to be withheld from employees, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement.

2.    All sales, use, personal property and other taxes (including interest and penalties thereon) required by any Federal, State, County, Municipal or other law to be paid or collected by the Subcontractor or any of its subcontractors or vendors or any other person or persons acting for, through or under it or any of them, by reason of the performance of the Work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services or other items for or in connection with the Work.

**Taxes and Contributions**

3.    All pension, welfare, vacation, annuity and other union benefit contributions payable under or in connection with labor agreements with respect to all persons, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement.

In furtherance of, and in addition to the agreements, duties obligations and responsibilities of the Subcontractor with respect to the payment of sales, use, personal property and other taxes set forth in Articles IV and XVI of this Agreement, the Subcontractor agrees to reimburse and otherwise indemnify Turner and the Owner for any expenses, including legal fees and litigation arising from, or related to the Subcontractor's failure to pay any sales, use, personal property or other taxes based upon labor, services, materials, equipment or other items acquired, performed, furnished or used for or in connection with the Work.

**Patents**

Article XVII. The Subcontractor hereby agrees to indemnify, protect and save harmless Turner and the Owner from and against any and all liability, loss or damage and to reimburse Turner and the Owner for any expenses, including legal fees and disbursements, to which Turner and the Owner may be put because of claims or litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the Work or materials, equipment or other items used by the Subcontractor in its performance.

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

FORM 36 REV 2/12/01

**Mechanics' Liens or Claims**

Article XVIII. To the [ ]est extent permitted by law, Subcontractor for i[ ] and for its subcontractors, laborers and materialmen and suppliers and a[ ] others directly or indirectly acting for, through or under it or any of them covenants and agrees that no liens or claims, whether a mechanics' lien or an attested account or otherwise, will be filed or maintained against the Project or Premises or any part thereof or any interests therein or any improvements thereon, or against any monies due or to become due from the Owner to Turner or from Turner to the Subcontractor, for or on account of any work, labor, services, materials, supplies, equipment, or other items performed or furnished for or in connection with the Work, and the Subcontractor for itself and its Subcontractors, laborers, and materialmen and suppliers and all others above mentioned does hereby expressly waive, release and relinquish all rights to file or maintain such liens and claims and agrees further that this waiver of the right to file or maintain such liens and claims shall be an independent covenant and shall apply as well to work, labor and services performed and materials, supplies, equipment and other items furnished under any change order or supplemental agreement for extra or additional work in connection with the Project as to the Original Work covered by this Agreement.

If any subcontractor, laborer, materialman or supplier of the Subcontractor or any other person directly or indirectly acting for, through or under it or any of them files or maintains a lien or claim, whether a mechanics' lien or an attested account or otherwise, a mechanic's lien or claim against the Project or Premises or any part thereof or any interests therein or any improvements thereon or against any monies due or to become due from the Owner to Turner or from Turner to the Subcontractor, for or on account of any work, labor, services, materials, supplies, equipment or other items performed or furnished for or in connection with the Work or under any change order or supplemental agreement for extra or additional work in connection with the Project, the Subcontractor agrees to cause such liens and claims to be satisfied, removed or discharged at its own expense by bond, payment or otherwise within ten (10) days from the date of the filing thereof, and upon its failure to do so Turner shall have the right, in addition to all other rights and remedies provided under this Agreement and the other Contract Documents or by law, to cause such liens or claims to be satisfied, removed or discharged by whatever means Turner chooses, at the entire cost and expense of the Subcontractor (such cost and expense to include legal fees and disbursements). The Subcontractor agrees to indemnify, protect and save harmless Turner and the Owner from and against any and all such liens and claims and actions brought or judgments rendered thereon, and from and against any and all loss, damages, liability, costs and expenses, including legal fees and disbursements, which Turner and/or the Owner may sustain or incur in connection therewith.

**Assignment and Subletting**

Article XIX. To the fullest extent permitted by law, Subcontractor agrees that it shall not assign, sell, transfer, delegate or encumber any rights, duties or obligations arising under this Agreement including, but not limited to, any right to receive payments hereunder, without the prior written consent of Turner in its sole discretion and the giving of any such consent to a particular assignment shall not dispense with the necessity of such consent to any further or other assignments. In the event Subcontractor assigns, sells, encumbers or otherwise transfers its right to any monies due or to become due under this Agreement as security for any loan, financing or other indebtedness (hereafter "Assignment"), notification to Turner of such Assignment must be sent by certified mail, return receipt requested, to the Purchasing Manager in charge of the business unit responsible for the construction of the Project and the Assignment shall not be effective as against Turner until Turner provides its written consent to such Assignment. Subcontractor agrees that any such Assignment shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and the other Contract Documents and shall not create a contractual relationship or a third party beneficiary relationship of any kind between Turner and such assignee or transferee. Subcontractor further agrees that all of Turner's defenses and claims arising out of this Agreement with respect to such Assignment are reserved unless expressly waived in writing by a duly authorized corporate officer. Subcontractor hereby agrees to indemnify and hold harmless Turner from and against any and all loss, cost, expense or damages Turner or Owner has or may sustain or incur in connection with such Assignment.

**Termination for Convenience**

Article XX. Turner shall have the right at any time by written notice to the Subcontractor, to terminate this Agreement without cause and require the Subcontractor to cease work hereunder {, in which case, provided the Subcontractor be not then in default, Turner shall indemnify the Subcontractor against any damage directly resulting from such termination}. In the event of such a termination for convenience, the Subcontractor shall be entitled to payment pursuant to the terms of the subcontract for all Work performed as of the date of termination, together with reasonable costs of demobilization and such other reasonable costs as may be encountered by the Subcontractor and directly attributable to such termination provided that such amount shall be reduced by all amounts for which Subcontractor is liable or responsible hereunder. However, the Subcontractor shall only be entitled to profit on that portion of the work actually performed and approved for payment to the date of termination together with retainages held upon payments made prior thereto. Subcontractor waives any claim for loss of anticipated profits or other damages in the event Turner exercises this clause.

Article XXI. The Subcontractor hereby guarantees the Work to the full extent provided in the Plans, Specifications, General Conditions, Special Conditions and other Contract Documents.

The Subcontractor shall expeditiously remove, replace and/or repair at its own expense and at the convenience of the Owner any faulty, defective or improper Work, materials or equipment existing or discovered within one (1) year from the date of the acceptance of the Project as a whole by the Architect and the Owner or for such longer period as may be provided in the Plans, Specifications, General Conditions, Special Conditions or other Contract Documents.

**Guarantees**

Without limiting the generality of the foregoing, the Subcontractor warrants to the Owner, the Architect and Turner, and each of them, that all materials and equipment furnished under this Agreement will be of first class quality and new, unless otherwise required or permitted by the other Contract Documents, that the Work performed pursuant to this Agreement will be free from defects and that the Work will strictly conform with the requirements of the Contract Documents. Work not conforming to such requirements, including substitutions not properly approved and authorized, shall be considered defective. All warranties contained in this Agreement and in the Contract Documents shall be in addition to and not in limitation of all other warranties or remedies required and/or arising pursuant to applicable law. Failure of Subcontractor to honor and satisfy the foregoing and any other warranties or guarantees required of the Subcontractor under the Contract Documents, shall constitute a default by Subcontractor.

Article XXII. The Subcontractor agrees that the prevention of accidents to workmen and property engaged upon or in the vicinity of the Work is its responsibility. The Subcontractor agrees to comply with all Federal, State, Municipal and local laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the Work, including, among others, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules,

7

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials

Sub:
P.A.:

FORM 36 REV 2/12/01

regulations and orders which have been or shall be adopted or issued thereunder, and with the safety standards established during the progress of the Work by Turner. When so ordered, the Subcontractor shall stop any part of the Work which Turner deems unsafe until corrective measures satisfactory to Turner have been taken, and the Subcontractor agrees that it shall not have nor make any claim for damages growing out of such stoppages. Should the Subcontractor neglect to take such corrective measures, Turner may do so at the cost and expense of the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor. Failure on the part of Turner to stop unsafe practices shall in no way relieve the Subcontractor of its responsibility therefor.

**Accident Prevention**

This Subcontractor acknowledges the receipt of Turner's "Safety, Health and Environmental Policy", "Drug and Alcohol Abuse Policy" and Sexual Harassment Policy ". Subject to applicable law this Subcontractor further agrees to be bound to these policies as a part of the supplemental and special conditions to the contract for construction of the project.

In the event that hazardous substances of a type of which an employer is required by law to notify its employees are being used or stored on the site by the Subcontractor, the Subcontractor's sub-subcontractor and anyone directly or indirectly employed or otherwise retained by them or either of them, the Subcontractor shall immediately provide written notice of the chemical composition thereof (including, without limitation, a copy of the applicable Material Safety Data Sheet) to Turner in sufficient time to permit compliance with such laws by Turner, other subcontractors and other employers on the site. In the event that the Subcontractor encounters on the site material reasonably believed to be hazardous substances (including, without limitation, asbestos or polychlorinated biphenyl) which has not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and immediately report the condition to Turner in writing. Work in the affected area shall resume when such hazardous substances have been rendered harmless or removed as determined by Turner in its sole and absolute discretion. To the extent of Subcontractor's responsibilities hereunder, Subcontractor does indemnify and save harmless Turner from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, cost and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor in regard to such hazardous substances.

**Liability or Damage and Personal Injury**

Article XXIII. The Subcontractor hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of any tier of the Subcontractor or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the Work, or in preparation for the Work, or any extension, modification, or amendment to the Work by change order or otherwise. Except to the extent, if any, expressly prohibited by statute and excluding from this indemnity such acts or omissions, if any, of the party indemnified for which it is not legally entitled to be indemnified by the Subcontractor under applicable law, should any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon Turner's or the Owner's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of Turner or the Owner, the Subcontractor agrees to indemnify and save harmless Turner and the Owner, their officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, that Turner and the Owner, their officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof and the Subcontractor agrees to and does hereby assume, on behalf of Turner and the Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Turner and/or the Owner, their officers, agents, servants or employees upon or by reason of such claims and to pay on behalf of Turner and the Owner, their officers, agents, servants and employees, upon demand, the amount of any judgment that may be entered against Turner and/or the Owner, their officers, agents, servants or employees in any such action. In the event that any such claims, loss, cost, expense, liability, damage, penalties, fines or injury arise or are made, asserted or threatened against Turner and/or the Owner, their officers, agents, servants or employees, Turner shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in its judgment to protect and indemnify Turner and the Owner, their officers, agents, servants and employees from and against any and all such claims, loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, or Turner in its discretion may require the Subcontractor to furnish a surety bond satisfactory to Turner guaranteeing such protection, which bond shall be furnished by the Subcontractor within five (5) days after written demand has been made therefor.

In addition to Turner and the Owner, the Indemnified Parties throughout this Agreement shall include:
and any of their respective officers, agents, servants, or employees, and affiliates, parents and subsidiaries.

In furtherance to but not in limitation of the indemnity provisions in this Agreement, Subcontractor hereby expressly and specifically agrees that its obligation to indemnify, defend and save harmless as provided in this Agreement shall not in any way be affected or diminished by any statutory or constitutional immunity it enjoys from suits by its own employees or from limitations of liability or recovery under worker's compensation laws.

Before commencing the Work, the following insurance coverages from insurance companies satisfactory to Turner shall be in place and maintained until completion and final acceptance of the Work

1. WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE in accordance with laws of the State in which the Work is situated.

2. COMMERCIAL GENERAL LIABILITY INSURANCE INCLUDING COMPLETED OPERATIONS, CONTRACTUAL LIABILITY INSURANCE AGAINST THE LIABILITY ASSUMED HEREINABOVE, and including INDEPENDENT CONTRACTORS LIABILITY INSURANCE if the Subcontractor sublets to another all or any portion of the Work, Personal Injury Liability, Broad Form Property Damage (including completed operations), and Explosion, Collapse and Underground Hazards, with the following minimum limits:(Coverage shall be equivalent to ISO Occurrence Form 1996)

Combined Single Limit $ SEE OCIP MANUAL IN POLICY & PROCEDURE MANUAL

~~A) The above insurance coverages shall be provided by insurance companies selected by the Subcontractor. All costs are included in the Price and are to be paid by the Subcontractor.~~

OF

8

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Sub:
P.A.: 

Initials

~~B) The above insurance coverages shall be provided through a consolidated insurance program arranged by Turner. $ ——————— (The "Insurance Cost") is included in the Price to pay for the premiums for the above insurance coverages for this Subcontractor and its sub-subcontractors. Subcontractor shall include this Insurance Cost in its Application(s) for Payment (which Applications are to be submitted to Turner as provided herein) when and as directed by Turner. Turner will, when due, on behalf of the Subcontractor, make such payment by delivering the Insurance Cost (or the portion of the Insurance Cost that was included in the Application for Payment) to the relevant Worker's Compensation and General Liability insurance companies and Turner will deliver the balance of the Application for Payment due for Work completed to the Subcontractor. Upon completion of the enrollment process in the consolidated insurance program , the Subcontractor and its sub-subcontractors will be provided with their own individual Worker's Compensation Policy by the consolidated insurance administrator and will be a named insured under the General Liability policy issued on the project on behalf of Turner and its designated Subcontractors. The Subcontractor will incur a premium expense payable through Turner for such premium and Subcontractor hereby commits to record these costs as outlined above. All executed change orders will include an additional premium for Worker's Compensation and General Liability as applicable and will be included in Applications for Payment submitted to Turner, expensed by the Subcontractor and the premium paid by Subcontractor through Turner, as outlined above.~~

~~or~~

C)  The above insurance coverages shall be provided through an Owner Controlled Insurance Program (OCIP) as described in the Contract Documents.

Before commencing the Work, the Subcontractor shall procure and maintain, at is own expense, until completion and final acceptance of the Work at least the following insurance from insurance companies satisfactory to Turner

     3. COMMERCIAL AUTOMOBILE LIABILITY INSURANCE covering all owned, non-owned and hired automobiles used in connection with the Work, with the following minimum limits:

     Bodily Injury (including death)  $ 1,000,000.           per accident
     and Property Damage

     Before commencing the Work, the Subcontractor shall furnish a certificate, satisfactory to Turner from each insurance company showing that {the above insurance is in force, stating policy numbers, dates of expiration, and limits of liability thereunder, and further providing that the insurance will not be canceled or changed until the expiration of at least thirty (30) days after written notice of such cancellation or change has been mailed to and received by Turner. Turner, the Owner and other entities as may be reasonably requested shall be named as an additional insured under these policies of insurance. It is expressly agreed and understood by and between Subcontractors and Turner that the insurance afforded the additional insureds shall be primary insurance and that any other insurance carried by Turner shall be excess of all other insurance carried by the Subcontractor and shall not contribute with the Subcontractor's insurance. Subcontractor further agrees to provide endorsements on its insurance policies which shall state the foregoing; however, Subcontractor's failure to provide such endorsement shall not affect Subcontractor's agreement hereunder.

     If the Subcontractor fails to procure and maintain such insurance, if required, Turner shall have the right, but not the obligation, to procure and maintain the said insurance for and in the name of the Subcontractor and the Subcontractor shall pay the cost thereof and shall furnish all necessary information to make effective and maintain such insurance or at Turner's option, Turner may offset the cost incurred by Turner against amounts otherwise payable to Subcontractor hereunder.

     Article XXIV.  The Subcontractor shall furnish to Turner a performance bond in the amount of $ N/A and a separate payment bond in the amount of $ N/A the form and contents of such bonds and the Surety or Sureties thereon to be satisfactory to Turner. Such bonds shall be furnished to Turner within ten (10) calendar days after Subcontractor has executed this Agreement or within such other time period agreed to by Turner in writing. In the event Subcontractor fails to furnish such bonds to Turner within the time period as hereinabove provided, such failure shall constitute a default under this Agreement in which event Turner shall have all of the rights and remedies provided in Article XI hereof with respect to default on the part of Subcontractor including, without limitation, the right to terminate this Agreement.

     Without limiting the responsibilities of Subcontractor and its Surety under the terms of this Agreement, Subcontractor and its Surety hereby agree to promptly pay all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations for labor or services performed or materials, supplies, machinery equipment, rentals, fuels, oils, tools, appliances, insurance and other items furnished, used or consumed in connection with the prosecution of the Work provided for in said Subcontract and any and all modifications thereof, and shall indemnify and save harmless Turner of and from all liability loss, damage and expense, including interest, costs and attorney fees, which Turner and/or its Surety may sustain by reason of Subcontractor's or its Surety's failure to do so.

     Subcontractor and its Surety hereby agree to execute and deliver to Turner when requested in connection with the issuance of change orders under this Agreement, Rider "A" amendments (or other documents as Turner may require) increasing the amount (Penal Sum) of the Payment and Performance Bonds furnished by the Subcontractor. The reasonable premiums or other charges paid by the Subcontractor for the procurement of the Rider "A" amendments will be paid as a change to this Agreement.

     Article XXV.  In the event that any provision or any part of a provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable laws by an authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provisions or parts of provisions of this Agreement, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

9

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Sub:
P.A.:

FORM 36 REV 2/12/01

Article XXVI. This Agreement constitutes the entire agreement between the parties hereto. No oral representations or other agreements have been made by Turner except as stated in the Agreement. This Agreement may not be changed in any way except as herein provided, and no term or provision hereof may be waived by Turner except in writing signed by its duly authorized officer or agent. Subcontractor acknowledges and represents that it completed and submitted to Turner a prequalification questionnaire, that all statements therein were true, accurate and complete, and remain true, accurate and complete, and that Turner has relied on such statements in deciding to enter into this Agreement. The marginal descriptions of any term or provision of this Agreement are for convenience only and shall not be deemed to limit, restrict or alter the content, meaning or effect thereof.

E

A    ment

The said parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all of the terms and provisions herein contained.

In Witness Whereof the parties to these presents have hereunto set their hands as of the day and year first above written.

TURNER CONSTRUCTION COMPANY

In the Presence of: (Witness)

X _Steve Michalak_____
Steve Michalak
Purchasing Agent

By: _Brett Leven_____
Brett Leven
Purchasing Manager

In the Presence of: (Witness)

X _____

PERLECTRIC, INC.

By: _____
Official Title

Subcontractor's State Unemployment Ins. No.    0004839595
(Insert State and Register No. for State in which the Work is to be performed)

Subcontractor's License No.    270502315
(Insert License No., if any, for State or locality in which the Work is to be performed)

Subcontractor's State Sales Tax Registration No.    n/a

Subcontractor's Federal I.D. No.    54-1633092

10

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

ADDITIONAL PROVISIONS

AP I.    These Additional Provisions shall be **held** to be an **integral** and **binding attachment** to the Agreement, (sometime referred to hereafter as the Subcontract) dated **December 17, 2004, by and between** Turner Construction Company, referred to hereinafter as Contractor, and **PerLectric, Inc.,** referred to hereinafter as Subcontractor.

AP II.    It is hereby Understood and Agreed that Items $\underline{A}$ through $\underline{C}$ below are **part and parcel** of the Contract Documents referenced in Article I and are incorporated herein by reference, in their unabridged form.  Subcontractor acknowledges that he has read and understands the Contract Documents, and that the Subcontractor will fully comply with the scope and intent of the Contract Documents.

    A.    Turner Construction Company's Policies and Procedures Manual, including but not limited to, Turner's Safety and Drug and Alcohol Policies dated November 23, 2004, substance and receipt of which is hereby acknowledged.

    B.    Project Manual and associated Contract Documents as prepared by Davis, Carter, Scott, Ltd. dated August 13, 2004.

    C.    Agreement/Contract **by and between JBG/Rockwood 1101 K, L.L.C. c/o The JBG Companies** and Turner Construction Company dated October 14, 1004.  This Agreement may be reviewed at Turner's Office upon request.

AP III.    The scope of work contracted for pursuant to this Agreement, shall be in strict accordance with the referenced Contract Documents defined herein, and furthermore shall include but not be limited to the following work and associated operations.  This Subcontractor also acknowledges and agrees that the word "Contractor" in the Trade Specifications defining the Scope of this Agreement shall be construed to mean this "Subcontractor".

    A.    Division 01- General Requirements

    B.    See attached Scope of Work "Electrical" (Attachment "A") dated December 17, 2004 for further Inclusions.

    C.    The Subcontractor understands that other sections and portions of the specifications may be relevant to its Work and are therefore included in the Subcontractor's Scope of Work, for coordination purposes only.

AP IV.    Specifically excluded from the Scope of Work to be provided herein are the following:

    A.    Removal of existing hazardous materials.  (Except as noted within individual Scopes of Work).

    B.    See attached Scope of Work for "Electrical" (Attachment "A") dated December 17, 2004, 2004 for further Exclusions.

    C.    Requirement for providing a Payment and Performance Bond.

AP-1

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initial:
Sub:
P.A.: *SM*



AP V.          Alternates and Unit Pricing

Pursuant to Article IX of this Agreement, the following Alternate(s) and/or Unit Price(s) may be accepted by Turner Construction Company, at its sole discretion. The Alternate and Unit Prices noted herein are not part of the lump sum Contract Price reflected in Article IV. Inasmuch as these Alternate(s) and/or Unit Price(s) were anticipated from the inception of the project and were priced accordingly, all overhead, profit, insurance, taxes, bonds and escalation have been included within these alternates and unit prices which shall remain firm throughout the duration of the project, unless specifically noted herein.

    A.    Alternates:

        1)  See attached Scope of Work for "Electrical" (Attachment "A") dated December 17, 2004 for further Alternates.

    B.    Unit Prices:

        1)  See attached Scope of Work "Electrical" (Attachment "A") dated December 17, 2004 for further Unit Prices.

AP VI.    **Project Specific Requirements**

    **A.**    **Acceptance and Assignment by the Owner**

        1.    **This Subcontractor and Turner both understand and agree that the Owner must issue an executed form of Agreement to Turner, for the inclusion of the Work covered under this Agreement, in order for this Agreement to be valid. Furthermore, should Turner not receive an acceptable form of Agreement from the Owner (or receive an executed Approval Letter from the Owner accepting this Agreement), then both parties agree that this Agreement shall be null and void, and that TCCo shall have no financial obligation whatsoever to this Subcontractor.**

        2.    This Agreement shall be fully assignable to the Owner, upon his written request. It is agreed and understood that the Owner may accept said assignment at any time during the course of construction prior to final completion. In the event of an assignment, the Subcontractor will have the same obligations to the Owner as it had to Turner.

    **B.**    **Accounting Functions**

        1.    Partial Payments:

            A.    Monthly pay applications (requisitions) shall be made on **AIA forms G702 and 703.**

            B.    Subcontractor's written requisitions for payment shall be submitted to Turner on or before the **Twentieth (20th) day of the month projected to the end of**

AP-2

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

**the month**, or as determined by the project staff, showing the proportionate value of work completed through the end of the month. The value of the Work shall be based on the approved schedule of values for various portions of the Work and all authorized additions and deductions to the Contract Price.

    C.    Payment shall be made to the Subcontractor, pursuant to Article IV, on or about the **30th** of the following month.

2.    The cost or credit to the Owner resulting from a change to the Work shall be determined, as directed by the Owner, in one or more of the following ways:

    1.    By mutual acceptance of a lump sum derived from properly and sufficiently itemized and sufficient substantiating data as described below, submitted by the Contractor in a completely itemized breakdown showing:

        a.    Material types, quantities and unit prices (separated into trades), including cost of transportation.

        b.    Labor costs attributable to each phase or step of the change to the Work, including supervision, social security tax, old age unemployment insurance, dues and verifiable fringe benefits.

        c.    Construction equipment, including rental costs of machinery and equipment (exclusive of hand tools).

        d.    Workers compensation and commercial general liability insurance.

        e.    For changes in the Work performed by a Subcontractor with its own forces, the Subcontractor shall receive (1) two and one-half percent (2.5%) of the sum of items a. through d., above, for General Condition Costs, and (ii) two and one-half percent (2.5%) of the sum of items a. through d. and e. (i) for fee.

        f.    For changes in the Work performed by a Sub-subcontractor, the Sub-subcontractor shall receive (i) two and one-half percent (2.5%) of the sum of items a. through d., above, for General Conditions Costs, and (ii) two and one-half percent (2.5%) of the sum of items a. through d. and f. (i) for fee. The Subcontractor shall only receive two and one-half percent (2.5%) of the amount due a Subcontractor for fee. In no event shall the aggregate mark-ups for fee for a change to all Subcontractor and Sub-subcontractors of all tiers exceed ten percent (10%).

4.    Retainage and Final Payment Constraints.

**Retainage: Ten percent (10%) retainage will be held on all progress payments until substantial completion of the entire work.**

AP-3

Project #11000 – 1101 K Street
File/CSI  #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

    5.      Joint Check Policy

Payments under this Agreement may, at Turner's discretion, be made through the issuance of Joint Checks for materials required for the completion of this project. A Subcontract Information Letter or individual letters, issued by Turner and executed by the Subcontractor, Vendor, and the Bonding Company (if applicable), will be the vehicle through which Joint Checks are authorized or issued. Turner, however, is under no obligation to issue Joint Checks, and nothing herein is intended to grant the Subcontractor's suppliers, vendors, or materialmen any rights against Turner.

**C.**      **Insurance Requirements shall be in accordance with the OCIP Manual with the exception of Automobile Coverage which shall be in accordance with the Subcontract Agreement herein endorsed to include Turner Construction Company and the JBG/Rockwood 1101 K, L.L.C. c/o The JBG Companies (Owner) as additional insured..**

    1.      The Subcontractor agrees to provide not later than five (5) working days from date hereof, (but in all cases prior to the commencement of the work) certificates evidencing the required insurance coverage in accordance with the Subcontract. Subcontractor further agrees that notwithstanding any other provisions of this Agreement, all insurance policies covering the Work performed under this Agreement shall be endorsed to include **Turner Construction Company and the JBG/Rockwood 1101 K, L.L.C. c/o The JBG Companies (Owner) as additional insured**. It is understood and Subcontractor agrees not to commence Work under this Agreement until all of the insurance required herein has been obtained and certificates evidencing same are received and accepted by Turner Construction Company's Purchasing Department.

Subcontractor agrees all insurance policies required hereunder shall be endorsed to include the following provision: "It is agreed that this policy is not subject to cancellation, non-renewal, material change, or reduction in coverage without 30 days prior written notice has been given to Turner.

**D.**      **Liquidated Damages ( If required per the Owner's Contract )**

Time is of the essence in the performance of the Subcontractor's Work. The Subcontractor and its' Supplier(s), Vendor(s), Subcontractor(s) and materialmen agree to be liable for any consequential damages assessed Turner by the Owner, to the extent that the assessment of consequential damages is attributable to the Work furnished pursuant to this Agreement, but in no case shall the liability for damages be in excess of that assessed against Turner by the Owner.

Nothing herein, however is deemed to limit the damages for which the Subcontractor may be liable to Turner under any other Provisions of this Agreement.

**AP VII.**      **OSHA – 30 – Hour Training**

Subcontractor must commit field supervisory staff to register and complete, within three months of award, the Turner/OSHA 30 Hour Safety Certification training course via the Turner Knowledge Network (TKN). The cost for this training is $595.00 per person and certification is valid for three (3) years.

AP-4

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:



- Contract Value up to $5 million Subcontractor must have one (1) supervisory staff person must be certified.

- Contract value over $5 million Subcontractor two (2) supervisory staff persons must be certified

Subcontractors that can provide proof of industry recognized OSHA 30-Hour Training for valid supervisory staff with in the past three years, shall be exempt from the TKN Training requirement.

Subcontractor and all lower tier Subcontractors will comply with the requirements of Turner's OSGA 30-Hour Training Policy.

AP VIII.    **Project Coordination and Logistics**

A.    Subcontractor acknowledges and agrees it shall be represented on the project, while its work is in progress, by a competent full-time Project Manager and/or Superintendent who is satisfactory to the Contractor and/or Owner. Subcontractor agrees to cooperate to the fullest with the Contractor's Superintendent. Subcontractor agrees to, at all times, enforce strict discipline and good order among the workers on the project and shall not employ any unfit person, anyone not skilled in the work assigned to him, or anyone who will not work in harmony with those employed by the Contractor, other subcontractors, the Owner or the Owner's separate contractors and their subcontractors. Subcontractor agrees to remove immediately any workmen who are not satisfactory to the Contractor and/or the Owner.

B.    Subcontractor agrees to furnish all scaffolding, associated rigging, hoisting, unloading, handling, unpacking, and services necessary for erection and delivery into the premises of all necessary equipment and apparatus. Subcontractor agrees to remove same from premises when no longer required for the performance of this work.

C.    This Subcontractor agrees all layout work required to perform the work of this Agreement is included. Turner shall provide bench marks and control lines in the North-South and East-West direction. This Subcontractor shall provide any required supplementary lines and grades necessary for the completion of its Work.

D.    Timely performance is of the essence and this Subcontractor shall perform all of the requirements hereof with all possible dispatch and shall follow the progress of the work, be prepared to commence work when notified, keep up with the general progress of the whole work and shall be responsible for all damages caused by its delay.

E.    This Subcontractor agrees to provide the necessary traffic control, permits, etc. for his work including flagmen to assure an orderly flow of traffic in the area. Subcontractor further agrees to clean wheels or vehicles at areas designated by Contractor's project staff prior to vehicles entering public streets. Subcontractor agrees to clean streets as necessary in connection with Subcontractor's work should it be required.

F.    This Subcontract price includes reasonable (or mutually agreed upon) out-of-sequence work necessary to meet the project schedule.

AP-5

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

G.  This Subcontractor agrees to perform such quality control measures as will ensure that its portion of the Work conforms to the Contract Documents.

H.  This Subcontractor agrees all deliveries to the project site and on-site storage of all materials and/or equipment shall be coordinated with the Contractor's project staff.

I.  Subcontractor shall be responsible for all clean-up, removal, and proper disposal of its debris from the building and site **or "to Turner's on-site dumpster" (per Subcontractor's Scope)** upon completion of Subcontractor's work or as directed by Turner's project staff. Subcontractor agrees to remove all combustible debris from the building on the same working day it arrives or is uncrated. Additionally, this Subcontractor shall be responsible for the proper removal off-site of all hazardous materials introduced to the Project by this Subcontractor and/or his Employees/Subcontractors.

J.  Subcontractor further agrees, should Subcontractor fail to clean-up, remove and/or properly dispose off its debris from the building and site, upon written 24 hour notice by Turner, that Turner has the right to direct clean-up, removal and/or disposal of said rubbish and debris and all costs associated with same will be for Subcontractor's account.

K.  This Subcontractor acknowledges said work will proceed in accordance with the Project Schedule as developed by the "Project Team" (Turner Construction Company and its Subcontractors) and revisions made by the "Project Team". **Specific scheduling requirements shall also be a requirement of this project and of this Subcontractor.**

AP IX.  The Turner Corporation (hereinafter referred as Turner) "Safety" and "Drug and Alcohol Abuse" Policy;

To help insure a safe, healthful and productive work environment for the employees of Turner and others on site, and to insure efficient operations, Turner has adopted a policy of maintaining a workplace free of drugs and alcohol. This policy restricts certain items and substances from the workplace, prohibits company employees and others working on the site from reporting to work or working with measurable levels of illegal drugs, alcohol, and other controlled substances which affect the employee's ability to perform work safely.

To this end, Turner Construction, consistent with applicable laws, reserves the right to search any person entering the site and to search property, equipment and storage areas for illegal drugs, paraphernalia, unauthorized controlled substances, alcohol, and other intoxicants. This shall include, but not be limited to, clothing, personal effects, vehicles, buildings, plant facilities, offices, desks, cabinets, lockers, closets, lunch and tool boxes, and equipment.

Any person refusing to submit to a search will be denied access to or be asked to immediately leave the work site. Their employer shall be notified of such action.

All of the contractor's forces that work on this project will be required to undergo drug and alcohol testing prior to the start of work, regardless of length of time that the individual is on the site. Refer to Turner's Policies and Procedures Manual for additional information. This contractor accepts the terms of Turner's drug and alcohol testing policy. Cost for testing is by this Subcontractor. As of 10/1/04, the costs of testing are as follows: Each baseline test (prior to work on site) costs $35.00 per employee. Each follow-up test (Post-incident, reasonable suspicion, and random) drug test costs $35.00 per employee. Alcohol test cost $25.00 per employee for post-incident, reasonable suspicion, and random testing.

AP-6

Project #11000 – 1101 K Street
File/CSI #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

AP X.    Minority Business Enterprise Policy: ( If required )

Turner is committed to providing fair and representative opportunities for Minority and Disadvantaged Business Enterprises on its construction projects and expects its subcontractors to make the same commitment. Neither the Subcontractor nor its subcontractors shall discriminate on the basis of race, color, religion, sex or national origin in the award and performance of contracts to be utilized in constructing the project. Furthermore, affirmative action will be taken, consistent with sound procurement policies and applicable law, to ensure that Disadvantaged Business Enterprises are afforded a fair and representative opportunity to participate in Turner's subcontracts relating to the Project.

AP XI.    **Audit Procedures for Small Business and Minority Business Requirements ( If  required )**

    1.    **Until the expiration of four (4) years after the completion of this Agreement, the Subcontractor shall make available upon request to Turner Construction Company, or its duly authorized representatives, this Agreement and such books, documents, and records of the Subcontractor that are necessary to certify the nature and extent of the costs incurred by {OWNER} with respect to such goods and services for which payment may be made pursuant to any contractual requirement relative to MBE/SB participation.**

    2.    **Any sub-let work contracted for with third party companies in excess of $10,000.00 over a twelve month period, shall contain provisions similar to the above to allow audits by the aforementioned entities, upon request.**

AP XII.    Time is of the essence for the work detailed in this Subcontract Agreement.   For our mutual protection, this Subcontractor agrees to the timely execution of this agreement and any associated documents required by its terms. It is Turner's intent that contract signing/execution shall take place at the time of closing (while at Turner's office) except in unique cases authorized by Turner's Purchasing Manager.  Bonds and Irrevocable Letters of Credit, if applicable, and a validated insurance certificate are to follow the week thereafter.  Under no circumstances, however, shall this Subcontractor take more than five (5) working days, after receipt of a draft/review copy of this agreement, to present a signed agreement and fully enforceable insurance certificates, Performance and Payment Bonds (if applicable), or any other document required by the terms of this agreement. In the event that the above stated timetable is not met, Turner reserves the right to void this agreement in totality, without obligation, financial or otherwise, towards this Subcontractor, his/her suppliers, vendors, materialmen, etc.  Additionally, Turner reserves its right to pursue, through enforcement of the provisions of this Subcontractor's bid bond (if applicable), any recourse it may deem appropriate.

AP XIII.    In the event that any provision or any part of the provision(s) of this Agreement shall finally be determined to be superseded, invalid, illegal or otherwise unenforceable, pursuant to applicable law by an authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining provisions or parts of the Agreement, which shall be enforced as if the unenforceable provisions or parts were deleted.

END OF ADDITIONAL PROVISIONS

AP-7

Project #11000 – 1101 K Street
File/CSI  #16000 – Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:



Turner Construction Compar
1101 K Street
Washington, D.C.

Attachment "A"
December 17, 2004

**SCOPE OF WORK**
**Electrical**
**16000**

A. <u>GENERAL</u>:

This Subcontractor shall provides all labor, material, equipment, supervision, engineering, hoisting, tools, scaffolding, taxes, burden, overhead, profit, fringe benefits, insurance's, etc. necessary to complete all work associated with the <u>Electrical Work,</u> for the **1101 K Street** project located in Washington, D.C.

B. <u>SCOPE OF WORK - INCLUSIONS</u>:

The Work is based on Scope Documents. As scope documents, the drawings, details and specifications do not necessarily indicate all work required for the full performance and completion of the requirements of the Contract Documents. On the basis of the general scope indicated, the Subcontractor shall use all reasonable care to include those items necessary and/or implied, but not necessarily detailed, on the Contract Documents, including but not limited to the following:

Contract Drawings – (See Policy & Procedures Manual)

*Project Specifications dated August 13, 2004*

Complete Project Specifications Division 1 thru Division 14 are included by reference for work impacted and coordinated with the Electrical Trade.

Work described in the specification sections noted below as 'Provide' shall be included complete in the scope of this work:

| | | |
|---|---|---|
| 15010 | Mechanical General | As Pertains |
| 15050 | Basic Materials and Methods, Mechanical | As Pertains |
| 15180 | Insulation, Mechanical | As Pertains |
| 15200 | Noise and Vibration control | As Pertains |
| 15400 | Plumbing | As Pertains |
| 15500 | Automatic Sprinkler and Standpipe Fire Protection System | As Pertains |
| 15600 | Refrigeration | As Pertains |
| 15697 | Water Treatment | As Pertains |
| 15800 | Air Distribution | As Pertains |
| 15900 | Automatic Control Systems | As Pertains |
| 15925 | Energy Management and Control System | As Pertains |
| 15950 | Air and Water Balancing | As Pertains |
| | | |
| 16010 | Electrical Work General | Provide |
| 16050 | Electrical Basic Material and Method | Provide |
| 16163 | Electrical Distribution Equipment | As Pertains |
| 16210 | Emergency Generator | As Pertains |
| 16500 | Lighting | AS Pertains |
| 16721 | Fire Alarm System | Provide |

Turner Policy and Procedures Manual dated November 23, 2004

Project #11000 - 1101K Street
File #16000 - Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

Turner Construction Compa.
1101 K Street
Washington, D.C.

## SCOPE OF WORK
### Electrical
### 16000

The following items are for emphasis and clarity and do not limit the scope of work:

1. Subcontractor agrees that all layout work required to perform the work of this Subcontract is included. Subcontractor agrees that the initial building control lines and benchmarks are not included, but will be provided by Turner Construction Company.

2. The installation of this subcontractors work shall comply with all Federal, State, County, and/or Municipal rules, regulations, or ordinances, including those of noise abatement and environmental health protection.

3. Provide all design and engineering documentation to the Architect and Engineer of Record for review and comment.

4. Provide As-Built drawings, in CADD format, at the end of the project. Red lined As-Builts shall be kept up to date on site and subject to inspection with each payment application.

5. This Subcontractor understands that there may be "out of sequence work" required and has included such in this Agreement.

6. Provide labor, material and equipment to install and remove any temporary shoring required for your work.

7. Provide all permits, testing and inspections as required by the Contract Documents and/or required by the authorities having jurisdiction.

8. All work must be performed in accordance with all federal, state and local safety codes including but not limited to OSHA and TCCo's Safety Policy.

9. Clean up all debris from your work and incidental trash generated by your workers on a daily basis to a dumpster provided by Turner.

10. This subcontractor shall perform his work in accordance with the city and local jurisdiction authority regulations.

11. Furnish and install all miscellaneous supports for your work.

12. It is this Subcontractor's responsibility to obtain all permits and pay all fees required for your work, (including; as pertains to your work only, excavation, right of way, oversize equipment, trucking/hauling, etc).

13. This subcontractor agrees to participate in on-site Coordination meetings with a qualified, appointed authorized individual representing this Subcontractor. Mechanical Subcontractor to provide ductwork drawings as 'back grounds' for use by other trades for coordination. Adjustment to systems to allow for coordination will not be considered as an extra cost item.

14. Subcontractor herein acknowledges that they have examined the project site and are fully informed as to the nature of the work and conditions relating to its completion. Any special precautions required in order not to disturb existing construction are included.

- 2 -

Project #11000 - 1101K Street
File #16000 - Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

Turner Construction Company
1101 K Street
Washington, D.C.

Attachment "A"
December 17, 2004

## SCOPE OF WORK
### Electrical
### 16000

15. This Subcontractor understands, acknowledges and includes overtime for concrete operation or if work by its nature is done off-hours as required for the performance of this work, and all costs to complete the work in accordance with the Phasing Plan and Construction Schedule is included.

16. Within 10 days of award, this contractor shall submit for approval a billing breakdown (schedule of valves). Submittal Register indicating shop drawing/ sample submissions dates, including calculations shall be included.

17. All escalation costs are included in the contract amount.

18. Furnishing of access panels for installation by Drywall.

19. Receive, unload, inventory, store, hoist, set, install and start equipment furnished thru Turner Logistics. See attached sheet for listing. This subcontractor has all other materials and equipment necessary to provide a complete and fully operational system per the design intent.

20. Fire stropping / fire proofing as required.

21. Include sleeving of all deck openings. [Due to PT Slab Structure, core drilling will not be allowed.]

22. OCIP

23. TCCo Drug Testing Policy.

24. TCCo safety requirements including 100% tie off.

25. TCCo Pollution Control Policy.

26. Neighbor Impact Agreement

27. Comply with Government regulations regarding hours of operation and noise generation.

28. First source.

29. Provide 'Loose motor starters' for mechanical equipment.

30. Include excavation and concrete bases for light poles, all site lighting fixtures, conduit, and wire. Remove and reinstall the 5 existing light poles indicated on the drawings. Cut power to facilitate removal by Pepco if possible.

31. Include junction box and empty conduit home run for light within '1101' sign at front entry.

32. Include power connection to 'heat trace'.

33. Temporary power riser during construction as described in special conditions. The source for temp power will be within 10 feet from the building.

- 3 -

Initials
Sub:
P.A.:

Turner Construction Company
1101 K Street
Washington, D.C.

### SCOPE OF WORK
#### Electrical
#### 16000

34. Pepco ductbank from vault to building, with concrete encasement, from vault into our building, [Work on 'upstream' side of vault to point of connection is by others. Vault provided by others.]

35. Include, cut, cap and make safe, for removal by others of electrical items located on site. This includes but is not limited to site lighting, old electric feeders, abandoned telephone cables, etc. Excludes deenergizing costs where cut and made safe by Pepco.

36. Lighting at temporary sidewalk walkway/bridge based on incandescent stringers. See Alternate G if fluorescent is required.

37. Mechanical subcontractor will provide initial fuel fill of Generator tank, 300 gal. Electrical subcontractor to refill tank following testing to confirm that full tank is left for owner at turnover.

38. Include plywood backer boards in telephone and electric closets as required.

39. Furnish and install slab heating cables.

40. Lights in canopy and sconces on exterior of building.

41. Receive, unload, stage, install equipment provided by TCC Logistics- see attached list. Provide fuses for equipment provided by TCC Logistics.

**C. WORK EXCLUDED:**

The following items are excluded:

1. Independent testing and laboratory fees. Except as specifically included above (Owner or General Contractor).

2. Payment and performance bond. (Sub Guard)

3. Davis Bacon wage scales.

4. Installation of access panels.

5. Insulation over heat trace cable is excluded.

6. EMT conduit in garage decks, PVC included.

7. Any work or material within PEPCO Vaults.

8. ~~Fuses for Logistics furnished equipment.~~ TVSS for Switchboard is by TCC Logistics.

9. Remote annunciator for emergency generator is by TCC Logistics.

**D  BONDS/INSURANCE REQUIREMENTS:**

1. Subcontractor is to participate in Turner's Subguard Program therefore Performance and Payment Bonds are not required and is excluded from their price.

2. Subcontractor acknowledges that they have not included General Liability and Workman's Compensation Insurance in their price. This project will employ a Owner Controlled Insurance Program (OCIP). The Owner **WILL PROVIDE** the Insurance Policy for all **ON-SITE** work for General Liability and Workman's Compensation (WC). OCIP does not cover

- 4 -

Initials
Sub:
P.A.:

Turner Construction Company    Attachment "A"
1101 K Street    December 17, 2004
Washington, D.C.

SCOPE OF WORK
Electrical
16000

certain types of work. The Policy does not cover Auto Insurance or off site work.

3. For Auto Insurance and all **OFF-SITE** Work and activities, include your normal insurance. (Auto Insurance minimum coverage - Bodily Injury, including death $1,000,000 per accident).

4. Turner Construction and Owner shall be named as Certificate Holders/Additional insured.

E. <u>SCHEDULE:</u>

1. Subcontractor understands and acknowledges the 1101 K Street Construction Schedule 11SU dated 12-14-04 and the phasing of the project. Subcontractor further understands and acknowledges the following Project Critical Milestones:

2. Subcontractor acknowledges that they have included monies for any overtime and/or additional shift work that may be required to meet the above schedule's dates. Overtime work may be performed on the Project at the Subcontractor's discretion or as may be necessary to meet the Progress Schedule for the Work; provided, however, that the Subcontractor will not be entitled to additional compensation for work performed outside of regular working hours except as otherwise expressly authorized in writing by Turner prior to the performance of such overtime work. **Additional compensation for such authorized incidental overtime shall be limited to the direct cost of the premium portion of such authorized overtime, including payroll taxes, insurance, and additional benefits or dues, without markup for general conditions, overhead or fee.**

3. The ability of this Subcontractor to maintain schedule is a factor in the contract award. If the work progress falls behind the project schedule or established productivity rates due to Subcontractor's inefficiencies, the Subcontractor shall provide all means of schedule recovery at no additional cost to Turner or the Owner. This includes but is not limited to: the mobilization of additional equipment (either owned or rented) manpower, overtime/extended work hours, and overlapping shifts.

4. Provide all necessary move-ins to complete the project.

5. Subcontractor will work as necessary to maintain schedule above including weather based on five (5) year NOAA weather averages. This contractor will prepare a schedule for approval by Turner, which includes delays due to weather to show how this contractor plans to meet the Turner project Schedule.

F. <u>ALTERNATES:</u> Not Used

G. <u>UNIT PRICES:</u>

1. For fluorescent lighting in covered walkway, if incandescent stringer is not acceptable (included)    $ 35.00 / L.F.

2. Weighted average Labor Rate for Changes    $ 65.96 / Hour

- 5 -

Initials
Sub:
P.A.:

Turner Construction Company
1101 K Street
Washington, D.C.

SCOPE OF WORK
Electrical
16000

H.  **ADMINISTRATIVE:**

1.  Within 10 days of award this contractor shall submit a billing breakdown (schedule of values) for approval.

I.  **SAFETY/OSHA 30 REQUIREMENTS:**

1.  As a commitment to safety, Subcontractor agrees that Subcontractor and all lower-tier subcontractors will comply with the requirements of Turner's OSHA 30-Hour Training Policy:

    - For subcontracts up to $5 million in value, any one (1) of the supervisory staff must be OSHA 30-Hour certified within three (3) months of contract award by Turner.

    - For subcontracts greater than $5 million in value, any two (2) of the supervisory staff must be OSHA 30-Hour certified within three (3) months of contract award by Turner.

    - Only certifications dated April 1, 1998 or later will be accepted. Any additional training required by the policy must be done through Turner Knowledge Network (on-line). The cost for the TKN/ OSHA30 training will be borne by this Subcontractor.

    - The name of the OSHA 30 certified person who will be on site must be furnished to Turner Construction within two (2) weeks of contract award.

2.  The Owner Controlled Insurance Program (OCIP) being employed on this project requires a mandatory drug-testing program administered by Turner for all on-site construction workers. Subcontractor to include a drug-testing allowance of $65 per testing kit, per worker based on the anticipated number of workers planned by this subcontractor, including an additional 10% of volume for random drug testing.

J.  **SHOP DRAWINGS/SUBMITTALS:**

Complete and submit shop drawings, submittals, and samples within two (8) weeks after contract award.  Include any required manufacturers information, cuts, samples, drawings containing elevations, details, layouts, city approvals, etc.  Calculations shall be included. Only complete submittals will be forwarded to the Architect/Engineer. Incomplete submittal packages will be returned to the Subcontractor.

This contractor acknowledges that time is of the essence and all submittals required for this scope of work, including those that require a professional engineers stamp, will be submitted in a timely fashion so as to guarantee no delay to the start of this scope of work.

K.  **SITE LOGISTICS** (See Turner's Policies and Procedures manual for further detail)

1.  Temporary Power Requirements:

    - This subcontractor will provide additional task lighting and/or construction power (i.e. welding receptacles) required to perform their work.  All costs for procurement and maintenance of these additional power requirements will be borne by this

- 6 -

Initials
Sub:
P.A.:

Turner Construction Company
1101 K Street
Washington, D.C.

Attachment "A"
December 17, 2004

**SCOPE OF WORK**
**Electrical**
**16000**

subcontractor.

2. Material Deliveries:

- Include all required permits, fees, etc., as may be required for transportation of materials to and from the site.
- Delivery of materials to site shall be coordinated with Turner. Turner shall coordinate all schedules. 48-hour advance notice is required for all deliveries. Standard delivery hours are 7 a.m. to 3 p.m.

3. Hoisting:

- Provide all special hoisting and rigging as required to complete the work of this subcontract, including all strong-backs and other temporary-rigging devices as required.
- An engineered design will be submitted to Turner, prior to start of work, for all temporary shoring and bracing required performing this scope of work.

4. Site Parking:

- Contractor understands that there is absolutely no construction contractor parking on site at any time. All contractors parking will be off-site.

**END OF SCOPE OF WORK**

Project #11000 - 1101K Street
File #16000 - Electrical
Contract #008 – PerLectric, Inc.

Initials
Sub:
P.A.:

2/10/2005



# 1101 K Street
Washington, D.C.

## Pre-Purchase Equipment/Material List

As you prepare your Budgets, please know that Turner Logistics will pre-purchase the equipment and materials listed below for the above referenced project. The trade contractors must carry the **labor and misc. material** to receive, set, install, make final connections, and commission the following pieces of equipment:

<u>Electrical</u>

1. Switchboards -  $ToSS$
   - SWBD-A
   - SWBD-B
   - SWBD-C
   - Bus and Plugs

2. Motor Control Centers -
   - MCC

3. Emergency Generator

4. Automatic Transfer Switches (6) - **(Excluding the ATS for Fire Protection)**

5. Light Fixtures-

<u>Mechanical</u>

6. Fans -
   - F-1 thru F-25

7. Outside Air Handling Unit -
   - MUA-1

8. Cooling Towers-
   - CT-1 thru CT-3

9. Self Contained Water Cooled A/C Units –
   - SCU-B1 thru SCU-10

10. Plate Frame Heat Exchangers –
    - HX-1 and HX-2

11. Water Cooled A/C Units –
    - A/C-1 thru A/C-4


PLAINTIFF'S
EXHIBIT
C
PENGAD-Bayonne,N.J.

2/10/2005

12. Variable Frequency Drives –
   • For Cooling Towers, all Self-contained AC units, outside air units and closed loop pumps

Please contact James Thompson at 703-841-7059 as necessary with any scope or technical questions you may have.

JAN-31-2007  13:46    PERLECTRIC    703 352 5205    P.002



2711 Prosperity Avenue, Suite 300 • Fairfax, Virginia 22031-4308
Telephone: 703-352-5151 • Fax: 703-352-5155

January 11, 2007

Mr. David Duffy
Turner Construction Company
3865 Wilson Blvd
Suite 300
Arlington, VA 22203-1919

Reference: New Construction, 1101 K St. N.W., Washington, D.C.

Subject: Demand Notice for Final Payment

Gentlemen:

We hereby submit our request for final payment pursuant to our Subcontract in the amount of $1,525,840, which amount includes the balance due for base contract work and outstanding changes in the sum of $626,482, and our claim for additional labor in the amount of $899,358, which is defined below, due to performing the work under uncontemplated adverse working conditions.

Perlectric is submitting this request for additional compensation in accordance with prior written notifications and documentation supplied to Turner for recovery of labor inefficiencies sustained during the course of its performance on the project directly resulting from Turners failure to properly schedule the electrical work and coordinate the electrical work with proper deliveries of electrical equipment and the other trades. In short, Turner forced Perlectric into a drastically adverse changed method of piecemeal performance with no planning or logical sequencing. A normal type planned logical progression was turned into a piecemeal, service-call operation.

Instead of issuing an overall realistic coordinated project schedule, Turner utilized an ad hoc approach through verbal directives, fragmented emails, and miscellaneous on-site meetings. Our Subcontract contemplated the development of an overall coordinated logical sequential baseline schedule for achieving timely progress of the work. The lack of an integrated overall progress schedule resulted in Perlectric's piecemeal performance, requiring numerous uncontemplated mobilizations, demobilizations, concurrent activities, comeback work, and out-of-sequence activities.


PLAINTIFF'S
EXHIBIT
D

Attn: Mr. David Duffy
Turner Construction Company
January 11, 2006
Page (2)

Turner supplied most of the critical electrical distribution materials and equipment for the project including Switchboards, Motor Control Center, Power Bus Duct distribution equipment, Emergency Generator, Emergency /Transfer Switches, Fixtures lamps, and Dimming System. Turner's repeated failure to provide complete or correct materials on a timely basis, constituted a failure of its duty to coordinate. Delay in ordering and delivery of critical electrical equipment resulted in Perlectric's out-of-sequence installation activities and was never contemplated when the contract was entered into by the parties. Largely due to Turner's improper work sequencing and ordering and delivery of equipment, Perlectric was subjected to a radically different method of installing the electrical work on this project and excessive labor costs. This failure to cooperate, schedule, coordinate, etc., amounts to active interference with the performance of Perlectric's subcontract work.

In addition to the out-of-sequence operations and interferences discussed above Perlectric was subject to adverse working conditions due to continuous substantial water leaks during Perlectric's final rough-in and trim-out activities. These activities were originally contemplated to be performed in a relatively dry environment. Unfortunately, as a result of numerous water intrusions, installed electrical work, which became wet, had to be removed, replaced, retested, and recertified. As a result of Turner's breach of the material aspects of the Subcontract and its active interference, Perlectric's performance was converted from a logical sequential performance to a radically different service-call type of project with numerous concurrent activities being applied on an ad hoc basis when work areas finally became available. Working in a small piecemeal segment, contrary to the express and implied terms of our Subcontract, required us to over-man the project at times and under-man the project at times, depending on when the work finally became available, resulting in a severe increase in manpower for both the base contract work and the change work. Also, the lack of a viable overall planned schedule resulted in a stacking of trades in limited work areas.

Despite numerous requests for an applicable time extension, due to the failure to provide suitable work areas for Perlectric to perform its work and/or requiring the work to be performed under adverse conditions, Turner failed to issue time extensions for the performance of the base contract electrical work or additional work required by changes. The net result was that Perlectric's work crews were forced into an illogical, uncoordinated, piecemeal manner of performance whenever work became available, all of which contributed to the man hour labor overruns of Perlectric.

Attn: Mr. David Duffy
Turner Construction Company
January 11, 2006
Page (3)

Enclosed herein is Perlectric's claim for the increased costs of labor and other costs for performing the base contract work under these uncontemplated adverse working conditions, including the applicable markups on the labor overrun. Please review same as soon as possible so that we can sit down and attempt to close out this contract in an amicable fashion.

Very truly yours,

Michael D Perle
/t

Encl:   Payment Bond #104425618
        Claim Summary for Inefficiency Costs

CC:     Travelers Casualty and Surety Company of America
        Federal Insurance Company
        Fidelity and Deposit Company of Maryland
        Zurich American Insurance Company

Reference: 1101 K Street NW Project

Subject: Claim Summary for Inefficiency Costs

Listed below is a Summary of Costs resulting from Turner's actions and interferences:

| | | |
|---|---|---|
| 1. | Labor inefficiencies 11,272 hours @65.96, Supervision | $743,501 |
| 2. | Extended Temporary Light and Power (10 weeks @ 40 hours @65.96) | $ 26,384 |
| 3. | Double handling of Turner Furnished Materials (256 hours @ $65.96 | $ 16,885 |
| 4. | Wage rate escalation | $ 18,900 |
| | Subtotal | $805,670 |
| | Extended Overhead | $ 50,351 |
| | | $856,021 |
| | Mark-ups | $ 43,337 |
| | Total | $899,358 |